NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0122n.06

**No. 09-6537**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Feb 1, 2012
LEONARD GREEN, Clerk

**LON S. WALKER,**

  **Petitioner- Appellant,**

**v.**

**JIM MORROW, Warden,**

  **Respondent-Appellee.**

_____ /

**ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE**

**BEFORE:    MARTIN, CLAY, and WHITE, Circuit Judges**.

  **CLAY, Circuit Judge.**  Petitioner Lon S. Walker, a state prisoner in Tennessee, appeals an

order denying his petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, in which he

challenged his conviction for second-degree murder.  For the reasons set forth below, we **REVERSE**

the district court's order.

**STATEMENT OF FACTS**

**I.    Factual Background**

  James "Howard" Harp and two cohorts, Stacey Patzer and Walker, were all highly

intoxicated when Howard was shot on Saturday, October 14, 1995.  That morning, Howard and his

brother, Jerry, visited a mobile home belonging to Walker, with whom the Harp brothers had been

acquainted for roughly one month.[1] The three men began drinking and, after they exhausted their supply of alcohol, drove to the adjacent county to buy more. On the way back, they stopped and picked up Walker's friend, Patzer. At the time, Patzer's husband was detained by local authorities awaiting trial. She described Walker as her "drinking budd[y]." (Pet'r App. 216.) Walker provided Patzer minor financial support while her husband was in custody, but Patzer denied that she was romantically involved with Walker.

Jerry, Howard, Walker, and Patzer returned to Walker's trailer and began an afternoon and evening of heavy drinking and socializing. Jerry described Patzer and Howard as "pretty well lit" by the evening. (*Id.* 176.) Patzer began to flirt with Howard and Jerry. Howard flirted back. Walker griped to Jerry about Patzer's flirting, expressing frustration that Patzer flirted with Jerry and Howard even though Walker provided Patzer financial support. At some point, Walker and Jerry retreated into Jerry's bedroom. There, Walker showed Jerry the .38-caliber revolver he kept near his bed. At some other point in the afternoon, Walker walked to his neighbor's trailer carrying a rum and Coke. Walker told his neighbor that he might need help in "kicking this guy's ass." (*Id.* 179.)

Around 7:30 p.m., Jerry drove Patzer back to her trailer so Patzer could check on her dogs. Jerry eventually returned to Walker's trailer with Patzer. Jerry soon left for the remainder of the evening, leaving Howard, Walker, and Patzer at Walker's trailer. Patzer told investigating officers that Howard used the revolver to play Russian Roulette at some point during the evening, though she later explained that she did not personally see Howard playing the game.

---

[1]The Court refers to Jerry and Howard Harp by their first names, in order to avoid any confusion from a reference to "Harp."

Around 9:00 p.m., Walker's friend, Eric Christensen, visited Walker's trailer. Christensen testified that Howard and Patzer were extremely intoxicated, while Walker was only mildly intoxicated. During Christensen's visit, Patzer called her mother and began crying. Howard hugged her during the call. Walker verbally threatened Howard and gestured at him with a clenched fist, apparently upset that Howard interrupted Patzer's phone call. Before leaving at 10:00 p.m., Christensen saw Howard and Walker shake hands, though Christensen could not recall whether Howard and Walker shook hands before or after the confrontation.

Around 10:50 p.m., Patzer, Howard, and Walker were talking while standing at the bar dividing Walker's kitchen and living room. Howard and Patzer stood three feet apart on the living room side of the bar, and Walker stood on the kitchen side. At 10:51 p.m., the revolver fired a shot vertically from the side of Howard's head through his temple. Patzer immediately called 911 in hysterics. Walker hung up the phone. Patzer asked Walker if he and Howard were playing a joke on her. Walker explained to Patzer that Howard was dead and that he would "take care of it." (*Id.* 242.) The 911 operator called the trailer back, and Patzer, who had moved into the trailer's bathroom, spoke with the operator. Walker was in his trailer alone during the period Patzer was in the bathroom speaking with the 911 operator. During her 911 call, Patzer repeatedly told the operator Howard shot himself.

When officers arrived at Walker's trailer, Walker was waiting in the driveway and told officers that Howard had shot himself. Officer James Lane described Walker's demeanor as calm. When officers entered the trailer to process the scene, they found Walker's revolver in his kitchen sink underneath a cup. The revolver contained one spent round and five live rounds. Investigators

also found water puddles around the sink. In a conversation with officers, Walker denied ever having seen the revolver and asserted that he was in the bathroom when Howard shot himself. Walker later admitted owning the revolver and explained that he denied ownership out of fear of being blamed for letting an intoxicated Howard come into possession of a gun.

Patzer told several individuals shortly after the incident that Howard shot himself. Patzer spent the first night after the incident with John and Willie Bennis. According to the Bennises' trial testimonies, Patzer told them Howard shot himself when Patzer refused his sexual advances and that she did not think the revolver was loaded. Patzer also submitted a written statement to police attesting that Howard shot himself.

Patzer's account changed two days after the shooting. After a two- or three-hour discussion with Officer Lane on Monday, October 16, Patzer told police that Walker shot Howard.

At trial, Patzer readily admitted that she told officers, the 911 operator, and others that Howard shot himself. After sobering up and speaking with police, Patzer explained, the events returned to her memory in "bits and pieces." (*Id.* 325.) She testified that Walker actually shot Howard. By her account, while the three individuals were gathered around Walker's counter, Walker made a sudden motion and, the next thing she knew, Walker held the revolver and Howard lay at her feet. Patzer explained that she was so drunk during and after the incident that she could not recall for almost two days how Howard was shot. She further explained that several factors contributed to her persistence in asserting that Howard shot himself in the days after the incident: the hysteria and confusion she suffered in the moments after the shooting; her desire to believe that

Howard shot himself; the copious amounts of alcohol she drank before and the day after the shooting; and her fear of Walker, who she said kept her nearby him in the days after the shooting.

Thus, the jury heard testimony from Patzer stating that Walker shot Howard, as well as several of her prior inconsistent statements stating that Howard shot himself. The court admitted most of these prior inconsistent statements—including statements Patzer made to police at Walker's trailer shortly after the shooting, her written statement to police, and statements to her husband and friends—solely for impeachment purposes. However, the judge admitted Patzer's statements to the 911 operator asserting that Howard shot himself as excited utterances, admissible to prove the truth of the matter asserted under Tennessee Rule of Evidence 803(2).

In his defense, Walker offered evidence that Howard was severely depressed and had acted on his suicidal feelings on several occasions. Between the ages of 15 and 23, Howard attempted suicide six times. Jerry testified that, on the morning of the incident, Howard said he was going to kill himself. Jerry further testified that his brother spoke especially often and intensely about suicide when he was intoxicated. Two of Howard's suicide attempts occurred when he was intoxicated. Howard's blood alcohol content was .40% when he was shot, which, according to the doctor who performed Howard's autopsy, was an alcohol content level at which fifty percent of the population would die.

Walker also offered testimony to further his contention that Patzer changed her story in order to obtain favorable treatment for her husband. During her discussion with police regarding Howard's death, Patzer asked police if they could release her husband from pretrial detention. Also, according to John and Willie Bennis, Patzer angered Willie Bennis on the night of the shooting after

Patzer told Bennis she would tell Officer James Lane "anything I have to to get my husband out of jail." (*Id.* 82. *See id.* 101.)

After the close of evidence, the parties made closing statements. During the government's closing statement, the assistant district attorneys general made five statements that Walker contends were improper. Defense counsel did not object to any of these statements. First, investigators testified that they found a spot of blood one-eighth of an inch in diameter on Walker's shirt, though the serologist offered no opinion about the source of the blood or the length of time it had been on Walker's shirt. In her closing statement, the lead prosecutor claimed the spot was the "splatter" of Howard Harp's blood. (*Id.* 366.) Walker contends the statement misrepresented the evidence of record.

Second, investigators swabbed Walker's and Patzer's hands for gunshot residue roughly two-and-a-half hours after the shooting. Howard's hands were swabbed roughly twenty-three hours after the shooting. The residue tests found no residue on Walker's or Patzer's hands and residue in an inconclusive amount on Howard's hands. The gunshot residue expert testified that the tests did not allow him to offer a sound conclusion about who fired the revolver. In her closing statement, however, the lead prosecutor stated that the test disclosed a small amount of gunshot residue on Walker's hands.

Third, the lead prosecutor claimed Walker knew about Howard's history of attempted suicide at the time of the shooting; Walker claims the statement lacked supporting evidence. Fourth, the lead prosecutor described Walker as "very cunning" and "very heartless" and lacking in remorse. (*Id.* 367.) Finally, the assisting prosecutor claimed the police officers who served as the lead

witnesses against Howard would not have investigated the shooting if Howard's death had been a suicide.

In his closing argument, defense counsel explained that the jury could consider Patzer's statements to the 911 operator as proof that Howard shot himself. Specifically, he explained that an excited utterance was presumed reliable because it occurred contemporaneously with a startling event and was therefore unlikely to be the product of fabrication and reflection. Counsel further noted that Patzer's statements to the 911 operator were excited utterances.

The court's charge to the jury contradicted counsel's statements. The court instructed the jury that it could use Patzer's prior inconsistent statements only to impeach her testimony; the judge did not instruct the jury that it could consider Patzer's statements to the 911 operator as excited utterances admissible to prove the truth of the matter asserted. Defense counsel did not object to the court's instruction and did not seek a clarifying instruction. At the state post-conviction evidentiary hearing, the court stated that the instruction was erroneous and that counsel was deficient by failing to object to the instruction. The court concluded, however, that Walker was not prejudiced by the error.

## II. Procedural History

Walker appealed his conviction and, in 1999, the Tennessee Court of Criminal Appeals affirmed the jury's verdict. *State v. Walker*, No. 01C01-9711-CR-00535, 1999 WL 219629 (Tenn. Crim. App. Apr. 16, 1999). The Tennessee Supreme Court denied Walker permission to appeal.

Walker moved for state post-conviction relief, raising several ineffective assistance claims. The state post-conviction court ruled that an objection from counsel regarding the jury instructions

was unlikely to lead to another outcome and that defense counsel was not deficient in declining to object to the prosecutors' comments during the state's closing statement. Walker appealed the same issues to the Tennessee Court of Criminal Appeals, which denied him relief in 2002. *Walker v. State*, No. M2001-01090-CCA-R3-PC, 2002 WL 31520654 (Tenn. Crim. App. Nov. 13, 2002). The appeals court concluded that any deficiencies in the court's instructions regarding Patzer's statements did not prejudice Walker. The Tennessee Supreme Court denied Walker permission to appeal.

Walker timely filed a *pro se* petition for a writ of habeas corpus on September 4, 2003, raising the ineffective assistance claims he raises here. After appointing Walker counsel, the district court denied Walker's request for an evidentiary hearing and denied his petition. *Walker v. Lewis*, No. 2:03-00096, 2009 WL 4827429 slip op. (M.D. Tenn. Dec. 14, 2009). The district court certified Walker's claims of ineffective assistance of counsel for appeal. Walker timely appealed the district court's order.

## DISCUSSION

### I. Standard of Review

On appeal of a denial of a petition for a writ of habeas corpus, we review the district court's conclusions of law *de novo* and its factual findings for clear error. *Lovell v. Duffey*, 629 F.3d 587, 593–94 (6th Cir. 2011). The Court accepts the state court's determination of a factual issue unless the petitioner upsets that determination by clear and convincing evidence. *Moss v. Hofbauer*, 286 F.3d 851, 858–59 (6th Cir. 2002) (citing 28 U.S.C. § 2254(e)(1)).

## II.    Legal Framework

### 1.    Antiterrorism and Effective Death Penalty Act ("AEDPA")

As amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254(d) allows us to grant a writ of habeas corpus to a state prisoner only if the state court's adjudication of his claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a determination that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

A decision is "'contrary to' clearly established federal law if 'the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decided a case differently than the Supreme Court on a set of materially indistinguishable facts.'" *Lundgren v. Mitchell*, 440 F.3d 754, 762 (6th Cir. 2006) (quoting *Williams v. Taylor*, 529 U.S. 362, 413 (2000)) (internal quotation marks and alterations omitted).  A state court decision is based on "an unreasonable application" of clearly established federal law if "the state court identifies the correct governing legal principle but unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 763 (quoting *Williams*, 529 U.S. at 413).  "Clearly established federal law" refers to "the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision."  *Id*. (citing *Williams v. Bagley*, 380 F.3d 932, 942 (6th Cir. 2004)) (internal quotations omitted).

AEDPA's limitations permit this Court to award a petitioner relief only if the state court's application of federal law is "objectively unreasonable," rather than simply incorrect.  *Goodell v.*

*Williams*, 643 F.3d 490, 495 (6th Cir. 2011) (quoting *Williams*, 529 U.S. at 409). To conclude that a state court's application of federal law was unreasonable, we must decide that "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011). Under this inquiry, the Court must first explain "what arguments or theories supported or . . . could have supported, the state court's decision." *Id.* Then, the Court must decide whether "fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Id.* Only if there is no basis for disagreement among fairminded jurists can the court award relief. *Id.* And, as the Supreme Court has explained, "[e]valuating whether a rule application [by a state appellate court] was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Harrington,* 131 S. Ct. at 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

In spite of these limitations, the Supreme Court has emphasized that AEDPA "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Id*. Rather, federal habeas review continues to serve the important role of "guard[ing] against extreme malfunctions in the state criminal justice systems." *Id.* (citation omitted).

Under AEDPA, the Court examines the last state-court decision on the merits. *Garcia v. Andrews*, 488 F.3d 370, 374 (6th Cir. 2007). The Court reviews the state court's determination of mixed questions of law and fact under the "unreasonable application" element of AEDPA. *Railey v. Webb*, 540 F.3d 393, 397 (6th Cir. 2008).

## 2.    Procedural Default

A federal court determining whether a petitioner has defaulted a claim must decide whether "(1) a state procedural rule exists that applies to the petitioner's claim, (2) the petitioner failed to comply with the rule, (3) the state court actually applied the state rule in rejecting the petitioner's claim, and (4) the state procedural rule is an adequate and independent ground upon which the state can rely to deny relief." *Thompson v. Bell*, 580 F.3d 423, 437 (6th Cir. 2009) (quoting *Frazier v. Huffman*, 343 F.3d 780, 790 (6th Cir. 2003)).  In order for default to bar federal review of a claim, the last state court providing a reasoned opinion must "clearly and expressly state[] that its judgment rests on a state procedural bar." *Frazier*, 343 F.3d at 791 (quoting *Harris v. Reed*, 489 U.S. 255, 263 (1989)).  A claim is not defaulted where the state court does not expressly reject the claim on the procedural basis, even if the petitioner's claim violates a state's procedural rule.  *Thompson*, 580 F.3d at 437.  Alternatively, even if the state court fails to reject a claim on a procedural basis, a claim is in default where the petitioner fails to raise the claim in state court and pursue it through state appellate review. *Id.*; *see Deitz v. Money*, 391 F.3d 804, 808 (6th Cir. 2004) ("A federal court is also barred from hearing issues that could have been raised in the state courts, but were not."), *abrogated on other grounds by Stone v. Moore*, 644 F.3d 342 (6th Cir. 2011).

## 3.    Ineffective Assistance of Counsel

A defendant is not vindicated in his Sixth Amendment right to counsel if "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). Thus, to prevail on an ineffective assistance of counsel claim, a petitioner "must demonstrate that counsel's

representation fell below an objective standard of reasonableness and that the [petitioner] was prejudiced by the ineffective assistance of counsel." *Carter v. Bell*, 218 F.3d 581, 591 (6th Cir. 2000) (citing *Strickland*, 466 U.S. at 687).

Representation is deficient under *Strickland* when counsel makes an error "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* (quoting *Strickland*, 466 U.S. at 687). To satisfy the prejudice element of *Strickland*, a petitioner must prove that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Lundgren*, 440 F.3d at 770 (quoting *Strickland*, 466 U.S. at 694). The Supreme Court defines a "reasonable probability" as "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

In addition to allotting the state court the level of deference AEDPA requires, the Supreme Court requires a reviewing court to give the state court further deference when analyzing the state court's application of a general, amorphous rule of constitutional law. The *Strickland* standard is "highly deferential." *Harrington*, 131 S.Ct. at 788. The Supreme Court requires that AEDPA review of a *Strickland* claim be even more deferential. Hence, if a federal court believes a state court was incorrect in deciding a petitioner's *Strickland* claim, it may only grant relief after determining that no reasonable argument supports the state court's disposition. *Id.*

## III. Failure to Object to Jury Instructions

### A. Deficient Performance

The trial court admitted numerous statements from Patzer indicating that Howard committed suicide, including statements from her 911 call, her written statement to police, and statements she

made to John and Willie Bennis. Among those statements, the court admitted Patzer's statements to the 911 operator as excited utterances "made while the declarant was under the stress of excitement caused by [a startling] event or condition." Tenn. R. Evid. 803(2). Thus, under Tennessee law, the jury was permitted to consider Patzer's 911 statements for the truth of the matter they asserted. *See State v. Barrett*, No. W1999-02002-CCA-R3-CD, 2000 WL 1840073, at *6 (Tenn. Crim. App. Dec. 12, 2000). Nonetheless, the trial court only instructed the jurors that prior inconsistent statements could be used to impeach Patzer. The court later admitted that the instruction was erroneous and that defense counsel should have objected. We agree.

There is no reason to believe counsel's failure to object flowed from sound strategic considerations. Walker's central strategy aimed to demonstrate both that Patzer's revised recount of the shooting was untrustworthy and that her initial account was true. His preferred outcome would have had the jury believe Patzer's statements to the 911 operator and, therefore, conclude that Howard shot himself. The foundation of his strategy was the admission of Patzer's statements to the 911 operator as excited utterances. Those statements were invaluable as evidence in support of Walker's theory. Tennessee law typically allows a court to admit a prior inconsistent statement for the purpose of impeachment only, on the premise that a typical prior inconsistent statement lacks sufficient indicia of reliability to serve as substantive evidence. *See* Tenn. R. Evid. 806; *State v. Stackhouse*, No. E2010-01972-CCA-R3-CD, 2011 WL 5620925, slip op. at *10 (Tenn. Crim. App. Nov. 18, 2011). As excited utterances admitted to prove that Howard shot himself, however, the admission of Patzer's 911 statements relied on the presumption that Patzer's observation of the shooting "produce[d] a condition of excitement which temporarily still[ed] the capacity of reflection

13

and produce[d] utterances free of conscious fabrication." *State v. Ramos*, 331 S.W.3d 408, 415 (Tenn. Ct. App. 2010) (quoting *State v. Land*, 34 S.W.3d 516, 528 (Tenn. Crim. App. 2000)). To the end of persuading the jury to rely on Patzer's statements as substantive evidence, counsel's closing statement emphasized the inconsistencies in Patzer's account and reminded the jury that statements she made shortly after the shooting were excited utterances free of conscious fabrication and, therefore, were dependable evidence tending to show Howard shot himself.

In light of this strategy, it was self-defeating for counsel not to object to the judge's failure to instruct the jury that it could rely on any excited utterances as substantive evidence. After providing the jury the evidentiary tools with which it could find that Howard shot himself, counsel did not object to the court's instruction taking those tools from the jury, thus rendering "meaningless" his defense based on the truth of Patzer's 911 statements. *Lucas v. O'Dea*, 179 F.3d 412, 419 (6th Cir. 1999). There is simply no reason that counsel would labor to prop up his defense with an argument regarding the evidentiary nature of Patzer's statements, only to have the court knock it down. The failure to object was the result of accident, inattention, or mistaken judgment.

Respondent minimizes counsel's error by describing the court's instructions as merely "incomplete" rather than incorrect. (Resp. Br. 19.) Because most of the court's instruction correctly explained the law governing prior inconsistent statements, this argument seems to run, the instruction was substantially correct and an objection was unnecessary. The distinction the government offers is patently unpersuasive. Whether the instruction is described as incomplete or incorrect, it barred the jury from using Patzer's 911 statements as evidence in support of the proposition that Howard shot himself. Given the central importance of the permissible use of

Patzer's excited utterances to Walker's strategy, no fairminded jurist could argue counsel's failure to object was not deficient. Even the trial judge admitted in post-conviction proceedings that counsel's failure to object was error on counsel's part. Hence, it is clear to us that counsel performed below an objective standard of reasonableness by failing to object to the court's omission of the instruction.

### B. Prejudice

There is a reasonable probability that counsel's objection to the trial court's instructions would have changed the outcome of Walker's trial. *See Lundgren*, 440 F.3d at 770 (citing *Strickland*, 466 U.S. at 694). Patzer's 911 statements were central to Walker's trial. As the post-conviction court explained, "[a]lmost every witness talked about the fact that Stac[]y Patzer had previously said the victim committed suicide." (Pet'r App. 445.) A proper instruction would have permitted the jury to use all the evidence presented at trial, for any purpose for which it was properly presented. That evidence included Patzer's statements to the 911 operator. Those statements were not trifling evidence. Rather, under Tennessee law, they supported the proposition that Walker shot himself. But the jury was not permitted to consider the full range of evidence presented at trial. The omission of any instruction on the evidentiary value of Patzer's excited utterances required the jury to treat those utterances identically to the myriad other statements that impeached Patzer. By prohibiting a certain use of Patzer's statements—the use most probative of Walker's innocence, to be sure—the court effectively excluded strong evidence in favor of Walker.

The state court applied *Strickland* unreasonably by concluding otherwise. The Tennessee Court of Criminal Appeals ignored the distinction between a typical prior inconsistent statement and

an excited utterance. It lumped together all of Patzer's prior inconsistent statements and assumed that they all had the same evidentiary value. That assumption is incorrect. Collapsing the distinction between these two types of inconsistent statements unjustifiably minimizes the different weights they carry, and, specifically, the potential weight Patzer's excited utterances carried in Walker's defense.

The post-conviction appellate court also understated the weight of the court's instructions in guiding the jury's deliberation. By treating all of Patzer's prior inconsistent statements the same, the state court assumed that an instruction from the court would have made no difference in the jury's deliberation. That assumption is incorrect as well. The argument that the jury could have believed Patzer's 911 statements because the jury heard them in court undercuts the very concept of providing a court's limiting instructions. An instruction on the evidentiary purpose of Patzer's excited utterances would have allowed the jury to distinguish those statements from Patzer's other statements, even her other statements implicating Howard in the shooting. *See United States v. Layne*, 192 F.3d 556, 573 (6th Cir. 1999). Had the judge so instructed the jury, we would have "presume[d] [jury instructions] to have been effective unless there is an 'overwhelming probability' that they were ignored." *Scott v. Mitchell*, 209 F.3d 854, 879 (6th Cir. 2000) (quoting *Richardson v. Marsh*, 481 U.S. 200, 208 (1987)); *see, e.g.*, *Hall v. Vasbinder*, 563 F.3d 222, 239 (6th Cir. 2009); *Bey v. Bagley*, 500 F.3d 514, 522 (6th Cir. 2007). Since the court did not instruct the jury regarding Patzer's 911 statements, we adhere to the corollary proposition: in the absence of an instruction regarding excited utterances, we presume the jury treated Patzer's 911 statements as it was instructed to treat Patzer's other inconsistent statements.

Predictably, Respondent contends that the state court correctly concluded the weight of the evidence implicating Walker overcame any deficiency in the judge's instruction. The evidence of Petitioner's guilt was, however, hardly overwhelming. The record contains ample evidence to support the contention that Howard shot himself. Howard's history included the expression of suicidal feelings and several suicide attempts. The very morning of the shooting, he told his brother that he planned to kill himself. Howard became more suicidal when he was intoxicated, and Howard was extremely intoxicated on the night of the shooting. Jerry explained that Howard became suicidal when he drank because he felt no one cared for him or loved him, and Patzer had rebuffed Howard's sexual advances prior to the shooting. And, of course, there was also evidence of Walker's innocence in the form of Patzer's panicked statements to the 911 operator that Howard committed suicide.

Moreover, while there was evidence suggesting that Walker shot Howard, much of that evidence was inconclusive. The state's strongest evidence was Patzer's testimony that Walker shot Howard, but the jury was well aware of the inconsistency in Patzer's story. Jerry and Christensen testified that Walker became angry when Patzer flirted with Jerry and Howard on the night of the shooting, but Christensen also saw the two men shake hands at another time. Walker asked his neighbor, Benjamin Johnson, to "back him up" in case Walker had to "kick this guy's ass," though Johnson testified that Walker did not specify to whom he was referring. Moreover, Walker had no more than a small spot of blood on his shirt, which, even assuming the blood was Howard's, is hardly supportive of the argument that Walker placed a gun to Howard's temple and fired. A gunshot residue expert's test of the residue on Walker's hands roughly two hours after the shooting

17

returned inconclusive. The same test on Howard's hands yielded more evidence of residue than did Walker's hands, even though Walker's hands were tested sooner after the shooting. Additionally, while Walker acted suspiciously in the time after the shooting, his behavior is consistent with his contention that he lied because he was afraid of being blamed for allowing an intoxicated Howard to possess the gun. Finally, and perhaps most importantly, the charge against Walker grew out of an uncorroborated event witnessed by three highly intoxicated individuals. Thus, while the jury may have returned a guilty verdict if properly instructed on Patzer's excited utterances, that outcome is hardly beyond doubt, to say the least.[2]

Thus, by failing to account for the force of the judge's instructions upon the jury, and by failing to consider the effect of the court's incorrect instruction upon the total mix of evidence implicating Walker, the state court unreasonably applied federal law.

---

[2]The circumstantial nature of the evidence against Walker, coupled with the highly probative nature of Patzer's 911 statements, place this case on different footing than *Berghuis v. Thompkins*, 130 S. Ct. 2250, 2264–65 (2010), in which the Supreme Court reversed this Court's decision granting the writ. There, an associate of the defendant, who had been tried and acquitted of the shooting for which the defendant was charged, testified that the defendant committed the shooting. *Id.* at 2257. We granted the writ partly on the ground that defense counsel failed to object when the judge did not instruct the jury not to use the associate's testimony as proof of the defendant's guilt. *Id.* at 2259. In reversing this Court's decision, the Supreme Court relied in part upon its decision that counsel's objection would not have led the jury to acquit the defendant "in light of all the other evidence of guilt." *Id.* at 2265. As we have explained, the evidence that Walker shot Howard was much weaker than the evidence of the defendant's guilt in *Berghuis*, where a surviving victim identified the defendant as the shooter, the defendant's friend testified that the defendant confessed to the shooting, and other evidence corroborated the defendant's guilt.

## IV. Failure to Object to Improper Closing Statements

### A. Procedural Default

Among the sub-claims of Walker's ineffective assistance claim, he contends that counsel was ineffective by failing to object when the prosecutors improperly claimed Walker knew about Howard Harp's history of suicide attempts and improperly bolstered Officer James Lane's testimony. The district court concluded Walker defaulted these sub-claims. That conclusion was incorrect.

No state court denied either of these sub-claims on a procedural basis. On post-conviction appeal, the Tennessee Court of Criminal Appeals noted that Walker challenged counsel's conduct of failing "to object to certain remarks, questions or inferences made by the State . . . in closing arguments." *Walker*, 2002 WL 31520654, at *10. The court then considered the claim and denied it on the merits. *See id.* at *11–12. Hence, in rejecting this portion of Walker's ineffective assistance claim, the Tennessee Court of Criminal Appeals' "decision was clearly based on its view of the merits of Petitioner's claim under federal law" rather than Walker's failure to comply with a state procedural rule. *Haliym v. Mitchell*, 492 F.3d 680, 693 (6th Cir. 2007); *see Thompson*, 580 F.3d at 437.

Walker raised these sub-claims in his habeas petition, clearly fashioning them as parts of an ineffective assistance claim. In response to Walker's petition, Respondent did not argue that Walker defaulted either sub-claim. Rather, he argued that the state appeals court's denial of Walker's ineffective assistance claim was not contrary to established Supreme Court precedent. Respondent only argued Walker was barred from raising the independent prosecutorial misconduct claims arising from the allegedly improper statements of counsel involved here. Therefore, Respondent waived

this defense by failing to raise it before the district court. *Matthews v. Parker*, 651 F.3d 489, 498–99 (6th Cir. 2011); *White v. Mitchell*, 431 F.3d 517, 524 (6th Cir. 2005). Any argument that Walker defaulted these sub-claims would have nevertheless failed, since the state court rejected the sub-claims on the merits. *See Thompson*, 580 F.3d at 437.

The district court read the state appeals court's generalized account of Walker's ineffective assistance claims to mean that Walker failed to raise these sub-claims in state post-conviction proceedings. *Walker*, 2009 WL 4827429, slip op. at \*29–31. This reading was incorrect, particularly given Respondent's decision not to argue in front of the district court that Walker's claim was defaulted.

Furthermore, the district court did not consider this claim as one for ineffective assistance of counsel. Rather, the district court incorrectly treated Walker's ineffective assistance claim as an independent prosecutorial misconduct claim, before concluding that Walker defaulted the claim. *Walker*, 2009 WL 4827429, slip op. at \*31 ("Petitioner did not present any of the facts of these prosecutorial misconduct claims as independent federal claims of prosecutorial misconduct to the state courts. Thus, these prosecutorial misconduct claims are subject to procedural default."). The district court may have been allowed to raise a procedural default defense *sua sponte*, *see Lorraine v. Coyle*, 291 F.3d 416, 426 (6th Cir. 2002), but that power assumes the court construes a defaulted claim as the petitioner has fashioned it.

Had the district court properly read Walker's ineffective assistance claim and concluded that it was defaulted, that conclusion would have been incorrect, because the Tennessee Court of Criminal Appeals rejected the claim on the merits. Therefore, the district court incorrectly concluded

that Walker defaulted his ineffective assistance claims based on counsel's failure to object to the prosecutors' bolstering Officer Lane's testimony and allegation that Walker knew of Howard Harp's history of suicide attempts.

## B.    Legal Framework

Defense counsel's failure to object to prosecutorial misconduct can amount to ineffective assistance of counsel. *See Hodge v. Hurley*, 426 F.3d 368, 377 (6th Cir. 2005). A petitioner's ineffective assistance claim based on counsel's failure to object will not succeed if the decision not to object flowed from objectively reasonable trial strategy. *Id.* at 385–86. The soundness of counsel's strategy becomes increasingly difficult to demonstrate the more outrageous the prosecutor's conduct. *See id.*

A prosecutor commits misconduct if improper comments from the prosecutor "so infected the trial with unfairness as to make the conviction a denial of due process." *Lundgren*, 440 F.3d at 778 (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)). The questions of whether a prosecutor's comments amount to misconduct, and whether the misconduct renders a trial fundamentally unfair, are mixed questions of law and fact reviewed *de novo*. *United States v. Francis*, 170 F.3d 546, 549 (6th Cir. 1999).

We employ a two-part test for reviewing a habeas petition's prosecutorial misconduct claim. First, a petitioner must demonstrate the prosecutor's comments were improper. *Broom v. Mitchell*, 441 F.3d 392, 412 (6th Cir. 2006). A prosecutor's conduct is improper if she makes an argument not based on evidence in the record, makes a statement calculated to incite the jurors' "passions and prejudices," or makes a comment aimed at "completely undercut[ting] the defendant's sole

21

mitigation theory." *Id.* (citing *Bates v. Bell*, 402 F.3d 635, 641 (6th Cir. 2005), *DePew v. Anderson*, 311 F.3d 742, 749 (6th Cir. 2002), and *Gall v. Parker*, 231 F.3d 265, 315 (6th Cir. 2000)).

Second, a petitioner must demonstrate that the prosecutor's conduct was flagrant. *Id.* In deciding whether a prosecutor's conduct was flagrant, this Court considers "(1) the likelihood that the remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) the total strength of the evidence against the [petitioner]." *Id.* (citation omitted).

### C.   Analysis

Walker alleges five comments from state prosecutors were improper and flagrant, and, accordingly, counsel's failure to object to the accused comments represented ineffective assistance.

First, Walker contends the prosecutor's description of the gunshot residue expert's testimony misrepresented evidence in the record. A forensic expert tested Walker's hands for gunshot residue. He found small amounts of barium and antimony, two of the three metals that compose gunshot residue. The expert described the amount of residue he found on Walker's hands as inconclusive and present at levels insufficient to allow him to conclude Walker fired the gun. In her closing statement, the prosecutor described the expert's testimony:

> Now, where does the defendant have minute amounts of gunshot residue on his hands? You'll recall [the expert] said he had them on the surfaces of his hands, I believe a little bit on one of the palms—I don't remember from my notes—but on the surfaces of his hands. So even though he washed his hands, and Mr. Davis from the lab testified that you can remove gunshot residue by washing your hands, but this defendant had gunshot residue, minute particles of gunshot residue, or the chemicals, two chemicals, in very small amounts of his hands.

(Pet'r App. 365.)

22

Second, Walker argues that the prosecutor misrepresented the evidence regarding blood found on the shirt Walker wore when Howard was shot. A serologist performed a test on a portion of the shirt stained by two small red spots. The serologist concluded that one of the spots one-eighth of an inch in diameter was dried human blood, but she could not determine the source of the blood or when it stained Walker's shirt. In her closing statement, the prosecutor described the contents of the red spots:

> [I]f you will look very closely up in this area of this T-shirt, if you'll look very, very closely to the spot and the splatter on that, the faded splatter on there, I believe that you will understand what [the investigating officer] saw if you can just imagine it being a little brighter color. We're not talking about smears of blood. We're talking about blood splatter, what happens when somebody pulls a trigger and blows somebody's brains out and the blood splatters. It splatters. It doesn't transfer. It's not smeared. It splatters.

(*Id*. 366.) Walker contends that counsel's description of the red spots as "splatter" was improper, because the serologist did not testify that both spots were human blood.

Third, Walker challenges counsel's failure to object to certain characterizations the lead prosecutor made during her closing argument:

> Mr. Walker is a very clever and a very cunning, very heartless [sic]. And I say that because the proof in this case showed you that. And I want to tell you specifically what I'm talking about. He has no remorse. At any time during this evidence that's been presented in this case did you hear one single time that he shed a tear or he said anything being remorse as far as this victim?

(*Id*. 367.).

Fourth, Walker contends the prosecutor misrepresented evidence in the record by asserting that Walker knew about Howard's history of suicide attempts. Jerry Harp testified that he had known Walker for roughly one month prior to the day of the shooting. The record before the Court

23

does not disclose whether Howard had previously met Walker before the day of the shooting or whether Walker had any knowledge of Howard's history. In her closing statement, the prosecutor argued that Walker knew about Howard's history of suicide attempts:

> Everybody in the world that knew the victim in this case and knew his family, including his friend, Mr. Lon Walker, his drinking buddy, knew that Howard Harp had threatened or attempted suicide on numerous other occasions . . . [Jerry Harp] testified in here that when [Howard] would get to drinking and he would get depressed that he would start feeling like nobody loved him and he would start threatening suicide, sometimes attempting suicide. And this defendant right over here who was friends with Jerry and Howard Harp went out drinking with them, hung out with them, knew all about that, and this defendant right over here took advantage of that situation . . . This defendant over here who was jealous, who knew this young man had a tendency to try, to threaten, to attempt suicide.

(*Id*. 363–64.) Walker argues the misrepresentation was significant, contending it created the impression that Walker knew he could shoot Howard and potentially blame the shooting on Howard.

Finally, the prosecutors referred to Officer Lane's investigation during their closing arguments, which Walker argues was improper. In her closing statement, the lead prosecutor expressed confidence in Officer Lane's investigation of Howard's death:

> [L]adies and gentlemen of the jury, I just want to say and I want to tell you that James Lane with the Cookeville Police Department has done an excellent job in this case investigating this case, and we are just asking you to find the truth. That's all we are asking you to do in this case.

(*Id*. 368.) The assisting prosecutor then explained how Patzer's discussions with Officer Lane led her to change her story and state that Walker shot Howard. In explaining why Officer Lane investigated the shooting, the prosecutor stated:

> Officer Lane told you that he had 154 active cases. Ladies and gentlemen, if this had been a suicide, he probably would have been happy to fold his case file up and let it go. But, as [defense counsel] said, we're after justice. And if he feels that was not

justice, then he's got to investigate. He didn't need another case. He's got plenty of them.

(*Id*. 389.) Walker contends the prosecutors' statements constituted misconduct, on the ground that it is improper for a prosecutor to bolster an officer's testimony or offer his personal opinion on the defendant's guilt. *See, e.g.*, *United States v. Warshak*, 631 F.3d 266, 303 (6th Cir. 2010).

The prosecutors' first three comments were not improper. The prosecutor quickly corrected herself after stating that the expert found gunshot residue on Walker's hands, describing the materials on Walker's hands as two of the chemicals that make up gunshot residue. As to the comments about the blood on Walker's shirt, counsel did not misrepresent the evidence presented to the jury. "Splatter" is not a term of art, and by using that term the prosecutor did not imply that the expert testified she found blood splatter on Walker's shirt. Rather, "splatter" is a colloquial term, which counsel used to argue that the spots on Walker's shirt were, in fact, spots of Howard's blood that fell on Walker's shirt. This argument was a proper attempt to lead the jury to an inference drawn from some evidence on record, which does not constitute misconduct. *See United States v. Henry*, 545 F.3d 367, 377 (6th Cir. 2008).

For the same reason, the prosecutor's comments regarding Walker's character were not improper. She drew her argument from Officer Lane's testimony that Walker appeared calm when officers showed up at her trailer, and the inference was a valid one. While this Court has concluded that a prosecutor commits misconduct by making an "animated recitation" of properly-admitted character evidence, *Washington v. Hofbauer*, 228 F.3d 689, 699 (6th Cir. 2000), and by asserting that members of the jury should be afraid to "run into [the defendant] at night," *Hodge*, 426 F.3d at 383, the prosecutor's comments in this case fell well short of the impropriety displayed in those cases.

By contrast, the remaining two sets of comments were improper. The record does not disclose that Walker knew about Howard's history of suicide attempts, and so it was improper for the prosecutor to assert that Walker knew of them. As this Court has explained, a prosecutor's act of misrepresenting facts in evidence is improper, since doing so "may profoundly impress a jury and may have a significant impact on the jury's deliberations." *Washington*, 228 F.3d at 700 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 646 (1974)). The record before the Court discloses no basis upon which the prosecutor could argue that Walker "knew all about" Howard's history of suicide attempts. The prosecutor's remarks were also flagrant: they were deliberate and extensive, spreading across roughly two transcript pages of her closing statement. Given the testimony that Walker had become angry with Howard earlier in the evening, the prosecutor's remarks potentially misled the jury into believing Walker could have formulated a plan to act on his anger. The comments are all the more troubling given that no other evidence supported the theory that Walker acted with the sort of premeditation that using knowledge of Howard's suicide attempts as an alibi would have entailed.

Even more troubling were the prosecutor's comments regarding Officer Lane's investigation, which bolstered and vouched for Lane's testimony. We have explained that "[b]olstering and vouching are much alike and go to the heart of a fair trial." *Francis,* 170 F.3d at 551. A prosecutor bolsters testimony when he "implies that the witness's testimony is corroborated by evidence known to the government but not known to the jury." *Id.* Vouching occurs when a prosecutor places the prestige of the government behind a witness with the prosecutor's personal assurance of the witness's reliability. *Id.* at 550. Vouching also occurs when a prosecutor expresses his "personal

belief" in the defendant's guilt, which this Court has repeatedly condemned. *Bess*, 593 F.2d at 755–56; *see Warshak*, 631 F.3d at 303.

While all of the prosecutors' comments lauding the officer's investigation were out of bounds, it was especially improper for the assisting prosecutor to assert that Lane "would have been happy to fold his case file up . . . if [Howard's death] had been a suicide." This comment directly violated the rule long recognized in our circuit that "it is always improper for a prosecutor to suggest that a defendant is guilty merely because he is being prosecuted or has been indicted." *Washington*, 228 F.3d at 701–02 (quoting *Bess*, 593 F.3d at 754) (internal quotation marks omitted). We announced that rule in *Bess*, in which an Assistant United States Attorney prosecuting a defendant accused of converting government property asserted to the jury that:

> If the United States did not believe the defendant was guilty of committing these charges in the indictment, based on the evidence that has been presented to you, this case, of course, would have never been presented to you in the first place. It would have never been presented to you.

*Bess*, 593 F.3d at 753. The case against the defendant in *Bess*, like the case against Walker, was one in which "[c]redibility was the key issue." *Id.* The comments in *Bess*, like the comments of the assisting prosecutor here, were "doubly inexcusable" since they were "made by a prosecuting attorney." *Id.* at 753–54. The jury deciding Walker's fate "face[d] difficult credibility issues" related to Patzer's testimony. *Id.* at 755. Bolstering and vouching are "especially problematic" in cases where the jury's verdict is likely to turn on witness credibility. *United States v. Combs*, 379 F.3d 564, 576 (9th Cir. 2004) (internal citations omitted). Making them even more problematic in this case is the fact that a law enforcement official's testimony was vouched for and bolstered, thus giving the assisting prosecutor's comments a "devastating impact." *Bess*, 593 F.3d at 755.

27

The assisting prosecutor's comments also implied that he personally believed Walker was guilty. *See Francis*, 170 F.3d at 550 (explaining that vouching can occur when a prosecutor's comments "imply," rather than state outright, his knowledge of facts outside the jury's view). The assisting prosecutor's comments set up a stark contrast. In one scenario, police would rule Howard's death a suicide, making Lane "happy to fold his case file up and let [the case] go." As the case turned out, however, Officer Lane sought out "justice" and investigated Walker. The comments equated acquittal with injustice, and forced the jury into a straightjacketed choice between the justice of a conviction and the injustice of an acquittal.

The comments were also flagrant. The prosecutor's remarks were relatively isolated, but we have recognized that, "[i]n some instances, a single forbidden comment is sufficient to poison the entire trial." *Warshak*, 631 F.3d at 307. We have just such an instance in this case: the comments about Officer Lane's investigation poisoned Walker's trial. The comments were not casual or off-handed, but were rather woven into the prosecutor's narrative detailing the change in Patzer's story and Officer Lane's decision to investigate the shooting as a homicide. Thus, the prosecutor's comments were deliberate.

Also significant in our flagrancy inquiry is the fact that the prosecutor's comments bolstered and vouched for the testimony and investigation of a law enforcement official rather than a lay witness. We have not hesitated to reverse convictions in which a prosecutor has vouched for or bolstered the testimony of a lay witness. *See, e.g.*, *Francis*, 170 F.3d at 551; *United States v. Carroll*, 26 F.3d 1380, 1389 (6th Cir. 1994). We find it more damaging that the assisting prosecutor here bolstered and vouched for a police investigator. If it poisons an entire trial for a prosecutor to

vouch for the truthfulness of a government witness testifying pursuant to a plea agreement, *see Francis*, 170 F.3d at 550, then it must be the case that comments vouching for the investigation and testimony of a law enforcement official does the same. Thus, the comments likely misled the jury, resting as they did on the assumption that jurors should trust a law enforcement official irrespective of the evidence before them. All told, no reasonable jurist could disagree with the conclusion that counsel's comments so poisoned Walker's trial as to deprive him of due process of law.

Petitioner's trial counsel could not have had a strategic basis for failing to object to the prosecutors' offending statements. Walker's chances of acquittal could gain nothing from a statement from the prosecutors appealing to the high regard in which law enforcement officials are held, particularly in a case low on hard evidence and staked largely on witness credibility. Defense counsel should have objected to the prosecutors' remarks.

For the reasons stated above, the state court unreasonably applied federal law in concluding that counsel's failure to object to these comments did not constitute ineffective assistance. *See Walker*, 2002 WL 31520654, at *11–12. While there may be reasons to conclude that counsel's failure to object to an improper remark is justified in other cases, none of those reasons apply here. In certain cases, counsel may reason that an objection would draw undesirable attention to the prosecutor's comments. *See Schauer v. McKee*, 401 F. App'x 97, 101 (6th Cir. 2010). That justification is unconvincing with regard to the prosecutor's comments about Officer Lane. Given the obvious potency of the prosecutor's comments and important role credibility judgments played in the jury's deliberations, the prosecutor's request that the jury assume fire existed where Officer Lane found smoke was too damaging to ignore. Moreover, while a single failure to object often does

not constitute error, *see Lundgren*, 440 F.3d at 774, the comments vouching for and bolstering Officer Lane were sufficiently severe to poison the entire trial, *see Warshak*, 631 F.3d at 307, rendering inexcusable counsel's decision to let them pass. The state court erred by overlooking these factors in concluding counsel was not ineffective for failing to object.

Counsel's failure to object prejudiced Walker. As we have explained, the evidence against Walker left the outcome of his trial far from certain, and the case against him turned largely on witness credibility. Thus, counsel's decision not to object to the prosecutor's comments freed jury members to allow the judgment of a law enforcement official to satisfy any doubts about the state's evidence. Hence, there is a reasonable probably that an objection from counsel would have led to a different outcome in Walker's trial.

## CONCLUSION

For the reasons stated above, the judgment of the district court is reversed, and a conditional writ of habeas corpus is issued, directing the State of Tennessee to retry Petitioner within 120 days from the date of this order or release him from custody.