RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 19a0089p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JESSICA R. ACOSTA (18-5207); LUIS R. MORALES-MONTANEZ (18-5212),

*Defendants-Appellants.*

Nos. 18-5207/5212

Appeal from the United States District Court
for the Eastern District of Kentucky at Lexington.
No. 5:17-cr-00040-2—Karen K. Caldwell, Chief District Judge.

Decided and Filed: May 15, 2019

Before: KETHLEDGE, WHITE, and BUSH, Circuit Judges.

_____

## COUNSEL

**ON BRIEF:** Russell J. Baldani, BALDANI, ROWLAND & RICHARDSON, Lexington, Kentucky, for Appellant in 18-5207. Paul Neel, Louisville, Kentucky, for Appellant in 18-5212. Charles P. Wisdom, Jr., UNITED STATES ATTORNEY'S OFFICE, Lexington, Kentucky, for Appellee.

BUSH, J., delivered the opinion of the court in which KETHLEDGE and WHITE, JJ., joined. WHITE, J. (pg. 27), delivered a separate concurring opinion in which KETHLEDGE, J., joined.

―――――――――

**OPINION**

―――――――――

JOHN K. BUSH, Circuit Judge.  A prosecutor "may strike hard blows" but "is not at liberty to strike foul ones."  *Berger v. United States*, 295 U.S. 78, 88 (1935).  The prosecutor crossed that line in this case.

A jury convicted Luis Morales-Montanez and Jessica Acosta of possession with intent to distribute 500 grams or more of methamphetamine.  On appeal, they argue that they were entitled to a judgment of acquittal because the government presented insufficient evidence to support their convictions.  In the alternative, they argue for a new trial because they allege numerous errors resulted in a fundamentally unfair proceeding, violating their due process rights.  There was sufficient evidence for their convictions.  However, because remarks made by the prosecutor rose to the level of flagrant misconduct and deprived Morales-Montanez and Acosta of a fair trial, we **VACATE** their convictions and sentences and **REMAND** for a new trial.

I.  BACKGROUND

After a raid on their home, Morales-Montanez and Acosta were indicted for possession with intent to distribute 500 grams or more of a substance containing a detectable amount of methamphetamine, possession with intent to distribute cocaine, possession with intent to distribute marijuana, and possession of firearms in furtherance of the cocaine and marijuana offenses.  Both defendants pled guilty to the cocaine, marijuana, and firearms charges, but they contested the methamphetamine count, which went to trial.

A.     The Arrests and Searches

The following relevant facts were presented at trial, which took place over three days in October 2017.

In the fall of 2016, Morales-Montanez and Acosta were living with Acosta's two children at 2428 Larkin Road (the "home") in Lexington, Kentucky.  Acosta had also recently leased an

apartment at 2504 Larkin Road (the "apartment"). The manager of the apartment building testified that she had given Acosta only one key.

Morales-Montanez and Acosta were suspected of drug trafficking, so Detective Matthew Evans of the Lexington Police Department began monitoring their movements in fall 2016. On several occasions, Evans and his team observed Morales-Montanez and Acosta at the apartment building. Twice, Evans gained entrance to the building and observed them enter the apartment itself. He also observed Morales-Montanez and Acosta driving between the home and the apartment building, and he believed they were driving evasively in a manner common to drug dealers who do not wish to be followed. Based on his surveillance, Evans obtained warrants for both the home and the apartment.

Officers from Evans's team searched the apartment on December 8, 2016. The search revealed, stashed in a closet, a plastic container filled with approximately two pounds of crystal methamphetamine. Officers also discovered packing materials, money orders, and air fresheners, which Evans testified were indicative of drug trafficking, in the apartment. While searching the apartment, officers also found various personal items, including, on a coffee table in the living room, a homework assignment bearing the name of Acosta's child "J.A."

Also on December 8, Evans arrested Acosta in a traffic stop and went with her to the home. There, Evans found Morales-Montanez, as well as numerous guns and copious amounts of marijuana and cocaine. The detective also discovered digital scales, packing materials, $42,507 in cash, money orders, a ledger, and a shrine to a statue of Jesus Malverde, who Morales-Montanez later testified at trial is worshiped as a "saint" by marijuana dealers. In addition, Evans found a set of keys to the apartment in the home.

Evans read Morales-Montanez and Acosta their rights and questioned them. Confronted with news of what officers had found in the apartment, Morales-Montanez initially responded that he knew nothing about the apartment. Shortly thereafter, Morales-Montanez admitted he had been to the apartment with Acosta, but he continued to deny knowledge of the methamphetamine. But Morales-Montanez very quickly admitted to dealing in marijuana and

cocaine: in fact, he called himself a "weed man" who had recently expanded into cocaine to beef up his income for the Christmas season.

Morales-Montanez and Acosta were detained pending trial. While detained, Morales-Montanez was temporarily housed with a man named Brian Barnes. Barnes was a former methamphetamine trafficker serving a seventeen-year prison term.

We will now pick up the story with Morales-Montanez and Acosta's version.

B.      The Defense Theory of the Case

Acosta chose not to testify, but Morales-Montanez and Barnes testified for the defense. The defense presented the following version of events.

Acosta knew that Morales-Montanez was running a marijuana operation out of the home, and she was not happy about it. When their relationship was at a crisis point and Morales-Montanez was visiting California, Acosta decided to rent the apartment. However, after Acosta signed the lease, she and Morales-Montanez patched up their relationship, and Acosta decided to keep living at the home and to sublet the apartment.

One day in late October 2016, Acosta was hanging flyers advertising the apartment at a grocery store when Brian Barnes (Morales-Montanez's future cellmate) noticed her and introduced himself. When Barnes learned that Acosta was seeking to sublet her apartment, he told her he wanted to rent. Acosta took Barnes to the apartment that day and showed him around. They agreed on a monthly rent of $625, and Barnes gave Acosta a $1,500 up-front payment.

As it turned out, Barnes was a large-scale methamphetamine dealer. He maintained multiple addresses to store drugs and drug paraphernalia, and he needed to move out of his primary residence because his roommates had deserted him after they learned he was having drugs shipped to him there. Barnes maintained that that was why he was looking for an apartment when he met Acosta. Barnes and Morales-Montanez both also testified at trial that neither Morales-Montanez nor Acosta was aware of Barnes's profession or of his reason for renting the apartment.

Soon Barnes fell behind on his rent. On several occasions, Morales-Montanez and Acosta went to the apartment to try to find him, but he was never there. On one visit, Morales-Montanez and Acosta did come across a stash of guns that Barnes had apparently left in the apartment. In place of the missed rent payment, Morales-Montanez took the guns back with him to the home.

Morales-Montanez testified that he did not recall ever having driven in an evasive manner between the home and the apartment. He also testified that the reason he had initially denied knowing anything about the apartment when questioned by Evans was that he had been afraid of getting in trouble for taking Barnes's guns.

Despite his stated reason for renting the apartment, Barnes testified that he went there only twice: once with Acosta when they were discussing terms and once very early in the morning on November 5, 2016. According to Barnes, he received a warning phone call on November 4 from a fellow drug dealer, Robert Griffett, who had been detained by the police and had tipped them to Barnes's activities before being released. Fearing that the police would seize his methamphetamine stash from his residence, Barnes immediately packed it into a plastic container and took it, along with his drug packaging materials and his guns, to the apartment.

Barnes did not evade the police for long. He was arrested on November 7, 2016, pled guilty to drug offenses, and was sentenced to twenty years' imprisonment, to be served at eighty-five percent for a prison term of seventeen years.

Then Morales-Montanez and Acosta were also arrested and charged. Morales-Montanez happened to be housed with Barnes in jail for several months beginning in early 2017. He had never met Barnes before that point or known that Barnes was the sublessee of the apartment. Although Barnes and Morales-Montanez testified that they never talked about their cases, Barnes stated that through his connections on the outside, he became aware that Morales-Montanez and Acosta had been charged with possession of the very methamphetamine he had secreted in the apartment. In January 2017, Barnes asked his attorney to set up a meeting with the prosecutor so that Barnes could put Morales-Montanez and Acosta in the clear. After the meeting—which

took place in July 2017—Barnes did not feel that his efforts had been successful, so he wrote to defense counsel[1] and signed on as a defense witness.

At trial, Barnes identified defense Exhibit 1 as the container of methamphetamine he said he had left in the apartment. He testified that he had earlier told a law-enforcement officer he had wrapped the methamphetamine in "clothes" before leaving it in the apartment, although he did not remember "[w]hat kind of clothes." R. 130, PageID 1230. As presented at trial, however, the container of methamphetamine was not wrapped in clothes, and the detective who found the container testified that it had not been "wrapped in anything" at the time. *Id.* at PageID 1141, 1144.

C.      Defense Counsel's First Motion for a Judgment of Acquittal

At the close of the evidence, defense counsel moved for a judgment of acquittal, arguing that no reasonable jury could convict Morales-Montanez and Acosta of possession of methamphetamine on the evidence presented. The court denied the motion.

D.      The Homework Issue and the Post-Trial Motion

During its deliberations, the jury sent out a note asking to see United States Exhibit 6, which was a copy of the homework assignment that officers had found in the apartment. The court responded by informing the jury that the homework had not been introduced in evidence, so the jury would have to rely on its memory of the homework during deliberations. Later, the court realized that the evidence had, in fact, been admitted; the court scheduled a hearing with the attorneys to determine what to do.

Shortly thereafter, Acosta filed, and Morales-Montanez joined, a motion for a new trial and in the alternative for a judgment of acquittal. The memorandum in support of the motion argued that (1) the district court had erred in keeping the homework exhibit from the jury and (2) the evidence presented at trial was not sufficient to convict Morales-Montanez and Acosta.

---

[1]Morales-Montanez and Acosta each had an attorney. We will refer to either or both simply as "defense counsel."

The district court held a hearing and denied the motion, reasoning that the homework exhibit was not exculpatory, so any error was harmless, and that the evidence was sufficient to support the convictions.

## II.  DISCUSSION

On appeal, Morales-Montanez and Acosta again argue that the evidence was insufficient to support their convictions, and they also argue that numerous alleged errors at trial rendered the proceeding fundamentally unfair.  They ask this court to remand with instructions to dismiss the methamphetamine count with prejudice or to reverse the district court's denial of the new trial motion.  Although Morales-Montanez and Acosta do not explain (and cite no cases explaining) why any of their theories of error would entitle them to a dismissal with prejudice of the charges against them, the substantive arguments in their briefing make clear that they believe the district court erred in denying their motion for a judgment of acquittal.  Therefore, we will begin by addressing whether Morales-Montanez and Acosta are entitled to a judgment of acquittal on sufficiency-of-the-evidence grounds.

A.     Sufficiency of the Evidence

We review de novo a district court's denial of a motion for a judgment of acquittal based on the sufficiency of the evidence.  *United States v. Humphrey*, 279 F.3d 372, 378 (6th Cir. 2002).  In doing so, we view the evidence in the light most favorable to the government and ask whether any rational trier of fact could have found Morales-Montanez and Acosta guilty beyond a reasonable doubt.  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  In answering that question, we must not weigh the evidence or make credibility determinations.  *United States v. Chavis*, 296 F.3d 450, 455 (6th Cir. 2002).  Instead, we must draw all reasonable inferences, including inferences from circumstantial evidence, in favor of the government.  *United States v. Rozin*, 664 F.3d 1052, 1058 (6th Cir. 2012).  "Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt." *United States v. Wettstain*, 618 F.3d 577, 583 (6th Cir. 2010) (citation omitted).

Morales-Montanez and Acosta argue that no rational trier of fact could have found they constructively possessed the methamphetamine found in the apartment.**²** The district court gave the following instruction on constructive possession:

> The government does not necessarily have to prove that the defendants physically possessed the mixture or substance containing methamphetamine for you to find them guilty of this crime. The law recognizes two kinds of possession, actual possession or constructive possession. Either one of these, if proved by the government, is enough to convict.
>
> . . . .
>
> To establish constructive possession, the government must prove that the defendants had the right to exercise physical control over the mixture and knew they had the right and that they intended to exercise physical control over the mixture or substance containing a detectable amount of methamphetamine at some time, either directly or through other persons.
>
> . . . .
>
> But understand just being present where something is located does not equal possession. The government must prove that the defendant had actual or constructive possession of the mixture or substance containing methamphetamine, and that they knew they did for you to find them guilty of this crime. This, of course, is all for you to decide.

R. 131, PageID 1454–55. The district court's instruction accurately articulated the elements of constructive possession. *See United States v. Jenkins*, 593 F.3d 480, 484 (6th Cir. 2010).

Although the evidence against Morales-Montanez and Acosta was far from overwhelming, it was sufficient for a rational jury to convict them of constructive possession with intent to distribute. The government presented the following evidence. (1) Detective Evans observed Morales-Montanez and Acosta at the apartment but (2) detectives had never seen Barnes—or anyone else—there. (3) Also, on multiple occasions, Evans or members of his team followed Morales-Montanez and Acosta driving between the apartment and the home, and Evans believed, based on his experience investigating drug dealers, that they were driving in an evasive manner to avoid being followed. (4) When Acosta leased the apartment, she was given only one

---

**²**Morales-Montanez and Acosta do not dispute that a rational jury could find the "intent" element of possession with intent to distribute if it could find the "possession" element satisfied.

key—according to the apartment manager—and yet a ring of multiple keys to the apartment was discovered in Evans's search of the home. That key ring made less plausible Morales-Montanez's claim that he and Acosta always visited the apartment together.

In support of acquittal, by contrast, the defense presented the testimony of Barnes and Morales-Montanez, who both swore that Barnes was responsible for the methamphetamine in the apartment. But the jury heard testimony that Barnes was housed with Morales-Montanez in jail, and the jury could have believed that the cellmates came to some agreement by which Barnes would take responsibility for the methamphetamine. If the jury found these two not to be credible—a determination that we are not permitted to second-guess, *see Chavis*, 296 F.3d at 455—then the government's case would look convincing.

In addition, several inconsistencies or questionable assertions appeared in Barnes's or Morales-Montanez's testimony, and the jury could have attributed them either to innocent mistakes or to lies, as it chose. For example, the government highlighted evidence that Barnes had received a shipment of methamphetamine at his residence after the date when he claimed to have moved his drugs, guns, and paraphernalia to the apartment. The appearance of the methamphetamine at trial—not wrapped in clothes as Barnes had described—also discredited Barnes's story. Furthermore, the jury could have chosen not to believe that Morales-Montanez initially denied knowledge of the apartment because he feared trouble over taking Barnes's guns. The jury could have believed that he had something more serious to hide.

In sum, a significant amount of evidence tied Morales-Montanez and Acosta to the apartment, and the jury was free to reject in total Barnes's and Morales-Montanez's insistence that Morales-Montanez and Acosta had nothing to do with the methamphetamine found in the apartment. Although this was not a straightforward case with direct proof of possession, we must view the evidence in the light most favorable to the government. In that light, we conclude that a rational trier of fact could have found beyond a reasonable doubt that Morales-Montanez and Acosta "had the right to exercise physical control over the [methamphetamine]" and "intended to exercise physical control over the [methamphetamine]," as the district court instructed the jury. The district court did not err in denying the motion for a judgment of acquittal or for a new trial on sufficiency-of-the-evidence grounds.

B.      Fairness of the Trial

Notwithstanding that there was enough evidence to support the convictions, we nonetheless vacate them and remand for a new trial because of numerous errors relating to the prosecutor's misconduct at trial that, considered cumulatively, deprived Morales-Montanez and Acosta of a fair proceeding.

Morales-Montanez and Acosta allege that three categories of error occurred during trial and rendered it fundamentally unfair.  First, they argue that the district court improperly allowed the prosecutor to question witnesses about the penalty for the methamphetamine count.  Second, they argue that the prosecutor's cross-examination of Morales-Montanez and the prosecutor's closing argument contained numerous prejudicial questions and remarks.  And third, they argue they suffered prejudice when the district court prevented the jury from seeing the homework exhibit during deliberations.

Between his cross-examination of Morales-Montanez and his closing argument, the prosecutor made nine improper and prejudicial remarks and questions that resulted in a fundamentally unfair trial.  Because we find that this prosecutorial misconduct entitles Morales-Montanez and Acosta to a new trial, we need not address the prosecutor's questions regarding the penalty or the homework issue.  *See United States v. Francis*, 170 F.3d 546, 548 (6th Cir. 1999) (remanding for a new trial on the basis of prosecutorial misconduct and not addressing the appellants' remaining arguments).

1.      Standard of Review

Not one of the prosecutor's statements drew an objection from trial counsel.  Therefore, we may remand for a new trial only if plain error occurred.  *United States v. Carroll*, 26 F.3d 1380, 1383 (6th Cir. 1994).  Plain error has three elements: "(1) error, (2) that is plain, and (3) that affect[s] substantial rights."  *Johnson v. United States*, 520 U.S. 461, 467 (1997) (alteration in original) (internal quotation marks omitted) (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993)).  "An error affects substantial rights if it affect[s] the outcome of the case."  *United States v. Walker*, No. 18-1256, 2019 WL 326483, at *3 (6th Cir. Jan. 24, 2019) (internal quotation marks omitted) (quoting *United States v. Teh*, 535 F.3d 511, 516 (6th Cir.

2008)).  "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings."  *Johnson*, 520 U.S. at 467 (alteration in original) (internal quotation marks omitted) (quoting *Olano*, 507 U.S. at 732).

To determine whether the prosecutor's alleged misconduct was "so exceptionally flagrant that it constitutes plain error, and is grounds for reversal even [though] the defendant did not object to it," *United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001) (quoting *Carroll*, 26 F.3d at 1385 n.6), we assess four factors:

> [1] the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; [2] whether they were isolated or extensive; [3] whether they were deliberately or accidentally placed before the jury[;] and [4] the strength of the competent proofs introduced to establish the guilt of the accused.

*Carroll*, 26 F.3d at 1384 (quoting *United States v. Leon*, 534 F.2d 667, 679 (6th Cir. 1976)). Morales-Montanez and Acosta argue that the prosecutor committed flagrant misconduct in this case.**[3]**

> 2.      The Prosecutor's Misconduct

> a.      Vouching or Bolstering

First, Morales-Montanez and Acosta argue that the prosecutor improperly vouched for or bolstered the testimony of government witnesses.  "Improper vouching occurs when a prosecutor supports the credibility of a witness by indicating a personal belief in the witness's credibility . . . ."  *Francis,* 170 F.3d at 550 (citations omitted).  Similarly, "[b]olstering occurs when the prosecutor implies that the witness's testimony is corroborated by evidence known to the government but not known to the jury."  *Id.* at 551 (citation omitted).

---

**[3]**Morales-Montanez and Acosta also argue that we may reverse even if the misconduct was not flagrant, because this court has reversed convictions for non-flagrant misconduct where defense counsel objected to some of the comments even if not to all; "the proof of the defendant's guilt [was] not overwhelming;" and "the trial court failed to cure the impropriety by failing to admonish the jury."  *Francis*, 170 F.3d at 550 (citations omitted). However, here, defense counsel did not object to any of the improper comments.  Therefore, we apply the flagrancy analysis.

During closing argument, the prosecutor made the following comments. First, in recapping the testimony of the detective who had found the methamphetamine in the apartment, the prosecutor stated: "Detective Bowles who was here, *he's testified very well, he understood and remembered everything he did*. Mr. Barnes told you that [the methamphetamine] was wrapped in clothes. No, it wasn't. As Detective Bowles testified, it was there, he picked it up and he brought it back down." R. 131, PageID 1391 (emphasis added). Second, the prosecutor later revisited the subject of Bowles's finding the methamphetamine:

> Now, make sure we put the evidence in the proper perspective. When Mr. Barnes testified, I asked him, did you say that the meth was wrapped in clothes? Yes. He said, I said that, that's what I did. Nobody made that up. It was [another law-enforcement officer, who had interviewed Barnes after his arrest] that came in that said, he told me it was wrapped in clothes. Detective Bowles, *a fine young man*, picked it up and there it was.

*Id.* at PageID 1435 (emphasis added). Third, Morales-Montanez and Acosta take issue with the prosecutor's characterization of Evans's work on the case: "Based upon the *fine work of Detective Evans*, based upon the search warrants that were executed, the interviews that were done, the two pounds of methamphetamine worth $20,000 is off the street." *Id.* at PageID 1402 (emphasis added).

Although these comments were not direct comments on the detectives' truthfulness, saying a witness is a "fine young man" implies that the speaker has a favorable view of the witness's truthfulness. Analogously, in *United States v. Modena*, 302 F.3d 626, 634–35 (6th Cir. 2002), we found that a prosecutor's description of a government witness as a "law-abiding man" was improper vouching because "a law-abiding man does not, of course, commit perjury." We do not mean to suggest that every favorable comment on a government witness constitutes prosecutorial misconduct, but in each case, the effect of such comments must be considered in the context of the prosecutor's other statements, the defense arguments, and the evidence presented at trial. *See United States v. Young*, 470 U.S. 1, 16 (1985) ("[E]ach case necessarily turns on its own facts." (citation omitted)). Here, the positive description of Bowles strikingly differed from the prosecutor's negative portrayals of the defense witnesses, as detailed later.

Moreover, we agree with Morales-Montanez and Acosta that the prosecutor's characterization of Bowles's testimony constituted improper vouching and bolstering. By opining that Bowles had testified "very well," the prosecutor suggested that he believed Bowles's testimony. And by stating that Bowles "remembered everything he did," the prosecutor made a factual assertion about Bowles's memory and reliability that had no basis in the evidence presented at trial and therefore invited the jury to believe Bowles simply on the prosecutor's say-so. *See Hodge v. Hurley*, 426 F.3d 368, 378–79 (6th Cir. 2005) (noting that comments on credibility "not coupled with a more detailed analysis of the evidence . . . convey an impression to the jury that they should simply trust the State's judgment" that a witness is or is not credible); *cf. Washington v. Hofbauer*, 228 F.3d 689, 700 (6th Cir. 2000) (finding misconduct where the prosecutor suggested a government witness's story had "been consistent over time," but "there was no evidence supporting that factual assertion"). In a case where credibility judgments were almost certainly determinative—because all of the government's evidence of guilt was circumstantial—such a comment may have been highly prejudicial. *See Hodge*, 426 F.3d at 376.

The reference to Evans as having done "fine work" also suggested that the prosecutor viewed Evans as an ethical detective and honest witness. In *Walker v. Morrow*, 458 F. App'x 475, 489–90 (6th Cir. 2012), we held that a prosecutor engaged in improper vouching when (among other comments) she told the jury that a law-enforcement officer had "done an excellent job in this case . . . and we are just asking you to find the truth." The statement in *Walker* more closely tied the officer's work to the result the prosecutor wanted the jury to reach than the prosecutor's statement about Evans in this case, but the comments are otherwise similarly phrased, and we find *Walker*'s reasoning persuasive. Although not overtly a comment on credibility and perhaps not harmful on its own, the comment on Evans contributed to the overall picture the prosecutor was painting of trustworthy government witnesses, a sharp contrast to the picture he painted of the defense witnesses.

b.          Attacks on Defense Witnesses' Credibility

During his closing argument, the prosecutor repeatedly made known his opinion that the two key defense witnesses were not credible.  First, the prosecutor offered the following thoughts on Barnes:

> In between the time [Barnes] said he was called by [Robert Griffett, who Barnes claimed warned him against law-enforcement officers] and the time he got arrested, he got yet another package of methamphetamine to the same address where he received the three previous packages.  If he was such a smart drug dealer and trying to avoid the police, why would he still have methamphetamine coming to his place?  *Because he's lying.  He is lying about taking that stuff over* [to the apartment].

R. 131 at PageID 1396 (emphasis added).  Near the end of his closing argument, the prosecutor attacked Barnes again: "Is he a huge drug dealer?  Yes, he is.  Huge.  Is he a weapons trafficker?  Yes.  Is he a money launderer?[4]  Yes.  *Should he be entitled to any credibility whatsoever?  Not at all.  Zero*."  *Id.* at PageID 1400 (emphasis added).  And shortly thereafter, the prosecutor was addressing  Morales-Montanez  and  Acosta's  argument  that  they  did  not  put  the methamphetamine in the apartment when he stated:

> The only people ever seen going into Apartment 172 as seen by Detective Evans, one and two [i.e., Morales-Montanez and Acosta].  And that's it.  There is not a shred of evidence that allows the sight of anybody else to go in there.  *Brian Barnes is a proven liar, don't believe anything he had to say.*

*Id.* at PageID 1401 (emphasis added).

The prosecutor also commented unfavorably on Morales-Montanez's credibility: "Luis Morales [sic], the worshiper of a deity of a drug trafficking entity who prays for protection from police, prosecutors, court systems and juries.  *Is he entitled to any credibility for what he said?  No, not at all*."  *Id.* at PageID 1400 (emphasis added).

---

[4]We are in the dark regarding to what the "money launderer" comment referred.  Barnes's testimony contained no discussion of money laundering or similar activity.  Although its prejudicial effect was probably minimal (because the jury already knew Barnes had admitted committing serious drug crimes), the prosecutor's reference to money laundering appears to have been an allusion to real or imagined facts not in evidence.  The "weapons trafficker" comment probably referred to Barnes's practice of sending shipments of guns to California as "blessings," a show of appreciation to his methamphetamine suppliers.  R. 130, PageID 1221–22.

"It is patently improper for a prosecutor either to comment on the credibility of a witness or to express a personal belief that a particular witness is lying." *Hodge*, 426 F.3d at 378 (citations omitted).

> [T]wo separate harms . . . arise from such misconduct. First, such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges . . . . Second, the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence.

*Id.* (internal quotation marks omitted) (quoting *Young*, 470 U.S. at 18–19). The second concern is particularly prominent when "statements by the prosecutor [are] not coupled with a more detailed analysis of the evidence actually adduced at trial." *Id.*

Here, the prosecutor's comments on credibility were especially damaging because the defense strategy was premised upon getting the jury to believe Morales-Montanez and Barnes. All of the evidence tying Morales-Montanez and Acosta to the methamphetamine was circumstantial. To acquit, the jury had only to find Morales-Montanez and Barnes's stories credible. The jury did not have to disbelieve the government's witnesses: it could have reconciled both sides' testimony by ascribing an innocent interpretation to each time the detectives testified they had seen Morales-Montanez and Acosta at the apartment. As the district court noted in its oral ruling on Morales-Montanez and Acosta's motion for a judgment of acquittal at the close of the evidence, "it really is a case of credibility for the jury to decide." R. 130, PageID 1367.

We have reversed in the past based on comments similar to the prosecutor's here. In *Hodge*, we reversed a denial of a writ of habeas corpus to a defendant convicted of child rape "where the only evidence sufficient to sustain a conviction was a jury determination that the complaining witness was more credible than the defendant," and the prosecutor had made numerous improper comments, including assertions that defense witnesses were lying, suggestions that the jury could consider character evidence as evidence of guilt, and misrepresentations of the evidence. 426 F.3d at 371. Among the improper comments was the *Hodge* prosecutor's statement in his rebuttal argument that "[the defendant] is not what he portrays himself to be, and that is because *he is lying to extricate himself from what he's done.*

*[The complaining witness] is absolutely believable, her family is absolutely believable*." *Id.* at 379 (emphasis in original) (citation omitted).

In finding that the defense counsel's failure to object to any of the comments constituted ineffective assistance of counsel, we found "a reasonable probability that the result of the proceeding would have been different" had the defense counsel made timely objections. *Id.* at 376. Here, the same logic dictates that there is a reasonable probability the prosecutor's comments affected the result at Morales-Montanez and Acosta's trial: as in *Hodge*, the jury's decision as to guilt or innocence turned on credibility assessments.

The government defends the comments on the basis that inconsistencies in Barnes's story or his conduct created "good reasons to doubt his truthfulness."[5] United States Br. at 17. But such doubts do not confer a blanket license to impugn a witness's credibility. Instead, the prosecutor should highlight inconsistencies with a "detailed analysis of the evidence." *Hodge*, 426 F.3d at 378; *see also Francis*, 170 F.3d at 552.

It is true that the prosecutor's comment that Barnes "was lying about taking" the methamphetamine to the apartment followed a brief rehash of evidence. Specifically, the prosecutor referred to testimony that Barnes had received drugs at his home address even after having been alerted to the danger of doing so. That would seem inconsistent with Barnes's story that he wanted to move all his drugs and paraphernalia to the apartment as soon as he knew the police might be after him. Nevertheless, that apparent inconsistency did not inexorably lead to the conclusion that Barnes was lying. The jury could have reasonably viewed the mailed-methamphetamine fiasco as the result of Barnes's shortsightedness in directing drug deliveries before his arrest, just as it could have viewed any apparent inconsistencies in his testimony as a result of mistake or forgetfulness. It was improper for the prosecutor to announce that he had made up his own mind about the reason for Barnes's testimony.

---

[5]Specifically, the government stresses that Barnes (1) was inconsistent in his recollection of who had called him and warned him about the police—at trial, he testified that Robert Griffett called him, but in a November 2016 post-arrest interview with a law-enforcement officer, Barnes had stated that a man named "J.T." called him; (2) Barnes did not take responsibility for the methamphetamine or mention Morales-Montanez, Acosta, or the apartment at the time of his arrest or in either of two November 2016 post-arrest interviews.

The prosecutor's next statement, that Barnes "[s]hould [not] be entitled to any credibility whatsoever," did not accompany a detailed recitation of evidence; it was simply advice to the jury about whom to believe. Indeed, the statement suggested that the jury should disbelieve Barnes because he had been involved in criminal activity. Although Federal Rule of Evidence 609(a)(1) allows an attorney to impeach a witness's character for truthfulness by introducing evidence that the witness has a conviction for a crime punishable "by imprisonment for more than one year"—such as Barnes's methamphetamine conviction—the prosecutor did not introduce the conviction as impeachment evidence, and he did not reference the conviction in stating that Barnes was not credible. Thus, the statement simply assumed that Barnes was not credible because of his criminal past without explaining why that past was relevant to truthfulness.

The third statement about Barnes, that he was "a proven liar," was also uttered with no evidentiary context. The prosecutor simply tacked it onto his statement that no one other than Morales-Montanez and Acosta had been seen at the apartment during the relevant time period. Indeed, the prosecutor's assertion that "[t]here is not a shred of evidence that allows the sight of anybody else to go in" the apartment came close to mischaracterization. Barnes's testimony, of course, was evidence that someone else had gone into the apartment, even if it was not eyewitness evidence from a detective that someone besides Morales-Montanez or Acosta had been "sight[ed]" there. The prosecutor was asking the jury to disregard crucial evidence that someone besides the two defendants had been at the apartment because, in the prosecutor's view, that evidence came from a liar.

We also note that the "proven liar" assertion came within a transcript page of the prosecutor's "fine work" vouching for Evans. The close proximity of a favorable comment on a government witness to an unfavorable comment on a defense witness heightens the prejudicial nature of both. *See Hodge*, 426 F.3d at 379–80.

Finally, the comment that Morales-Montanez was not "entitled to any credibility" was untethered to any relevant evidence suggesting untruthfulness. We will address the prosecutor's comments about Morales-Montanez thoroughly in the next section, but here we note that, again,

the prosecutor transgressed the bounds of permissible argument by telling the jury it should not believe a defense witness.

In sum, the prosecutor committed misconduct by repeatedly expressing his personal opinion that the defense witnesses were not credible. *See id.* at 378.

### c. Comments on Morales-Montanez's Prayers and the Ten Commandments

The prosecutor's references to Morales-Montanez's worship of the Jesus Malverde statue constitute their own category of misconduct. First, in questioning Morales-Montanez about the shrine found in the home, the prosecutor conducted the following exchange:

Q. You said that—that idol that you worship there is an idol that drug traffickers worship, correct?

A. Yes, sir.

. . . .

Q. And you would say prayers for protection, right?

A. Yes, sir.

Q. Pr[a]yers from the police so they don't get to follow you around, right?

A. Yes, sir.

Q. Did you say a little prayer before you walked into the courtroom today to your patron saint?

A. Did I pray to my saint?

Q. Yeah. Did you pray to that idol?

A. I prayed to the man upstairs.

Q. Uh-huh. But you didn't, like, pray to the drug trafficker's god that maybe the jury would believe me, right?

A. No, sir.

. . . .

Q. You consider yourself Catholic?

. . . .

A. I don't consider myself Catholic, I'm just a Catholic believer.

Q. Catholic believer? Do you understand that there is a Commandment that says thou shall not have any god before me?

A. Yes, I understand.

Q. But yet you prayed to the idol for drug traffickers for protection?

A. I did.

R. 130, PageID 1288–89.

In closing, the prosecutor again emphasized Morales-Montanez's prayers:

Another shocking thing yesterday was the defendant, Mr. Morales' [sic] testimony. Thou shall not have any Gods before me. I've never ever seen a defendant admit to worshiping Malverde. I'm not going to call it a saint, I'm going to use the word and call it a deity. He worships a deity . . . . He prayed for protection from police. He prays that he doesn't get caught.

For whatever religious or philosophical reasons, he's still trying to push away from Apartment 172. I wonder how many prayers he has said to Malverde before he walked into the courtroom yesterday. I wonder if what's going through his mind this morning was, I'm going to say another prayer for protection from the jurors of Central Kentucky.

. . . .

Luis Morales [sic], the worshiper of a deity of a drug trafficking entity who prays for protection from police, prosecutors, court systems and juries. Is he entitled to any credibility for what he said? No, not at all.

R. 131, PageID 1398–99, 1400.

We agree with Morales-Montanez and Acosta that Morales-Montanez's actual and supposed prayers to Malverde were "utterly irrelevant" to the question of guilt. Morales-Montanez Br. at 40. What is more, the prosecutor's statement in closing argument that he "wonder[ed] how many prayers [Morales-Montanez] ha[d] said to Malverde before he walked into the courtroom yesterday" conflicted with the evidence, because Morales-Montanez had denied during cross-examination that he prayed for the jury to believe him.

In the same vein, we can "find no nonprejudicial explanation" for the prosecutor's references to the Ten Commandments. *United States v. Grey*, 422 F.2d 1043, 1045 (6th Cir. 1970). Morales-Montanez's adherence or nonadherence to a Commandment had nothing to do with whether he possessed methamphetamine with the intent to distribute it. Furthermore, the part of the closing argument in which the prosecutor invoked the Ten Commandments and stated

that he had "never ever seen a defendant admit to worshiping Malverde" appears to have been an attempt to arouse the "passions and prejudices" of the jury against Morales-Montanez by suggesting that he was a particularly reprobate criminal defendant. *Bates v. Bell*, 402 F.3d 635, 642 (6th Cir. 2005) (citations omitted).

The government nonetheless suggests that the prayers to Malverde were relevant because, "[b]ased on Morales's [sic] admitted worship of Malverde, the prosecutor could reasonably infer that Morales [sic] was not restricting his prayers for protection to only his marijuana trade" and that therefore his denials of any connection with the methamphetamine were not credible. United States Br. at 16. This argument has two flaws.

First, if that is the inference the prosecutor was making, the prosecutor was also assuming—and asking the jury to assume—that Morales-Montanez in fact was involved in the methamphetamine trade. Otherwise, he would have no reason to pray for protection in that trade. That assumption puts the cart before the horse. The only evidence presented at trial that Morales-Montanez was dealing methamphetamine was the two pounds found in the apartment, and it was precisely Morales-Montanez's connection to those two pounds that the prosecutor sought to prove. More likely, the prosecutor was asking the jury to infer that Morales-Montanez was a methamphetamine dealer because he worshiped the Malverde statue—an unreasonable inference, because the government admits that Morales-Montanez described Malverde as the saint of *marijuana* traffickers (as Morales-Montanez testified, the word "Malverde" in Spanish means "bad green").**6** R. 130, PageID 1276. More likely still, the prosecutor was merely attempting to put Morales-Montanez in a bad light as someone steeped in drug culture, continually violating the first Commandment.

That leads to the second point: if the prosecutor was attempting to impeach Morales-Montanez's credibility, he was doing so based on inadmissible considerations. American

---

**6**One of the government's witnesses testified at trial that Malverde was "the patron saint of drug dealers" and was "commonly seen" in connection with "some of the larger scale drug traffickers." R. 126, PageID 782. That testimony could suggest that the "saint" was associated with drugs other than marijuana. However, no testimony was presented tying Malverde to methamphetamine specifically, and even the government notes that the statue was "an indicator of marijuana activity." United States Br. at 16. Of course, Morales-Montanez had already pled guilty to marijuana activity, and it was not in issue at trial.

"[c]ourts universally condemn the injection of religion into legal proceedings." *United States v. Roach*, 502 F.3d 425, 436 (6th Cir. 2007) (alteration in original) (internal quotation marks omitted) (quoting *Hicks v. Collins*, 384 F.3d 204, 223 (6th Cir. 2004)). Here, the prosecutor did more than "briefly highlight[] [Morales-Montanez's] testimony" with respect to Malverde, as the government argues; he also elicited testimony on Morales-Montanez's Catholic beliefs and then implied that Morales-Montanez was violating a biblical Commandment. United States Br. at 16. Under Federal Rule of Evidence 610, "[e]vidence of a witness's religious beliefs or opinions is not admissible to attack or support the witness's credibility." By the same token, credibility arguments based on religious affiliations or practices are not favored. *Cf. United States v. Rogers*, 556 F.3d 1130, 1141 (10th Cir. 2009) (citing Rule 610 and assuming without deciding that a closing-argument reference to a government witness's having worn a cross was improper).

We hold that the prosecutor engaged in misconduct through his questions and remarks about the Malverde statue.

3.      Flagrancy

Having concluded that nine remarks by the prosecutor were improper,[7] we ask whether they were flagrant and therefore warrant reversal despite defense counsel's failure to preserve objections. *See Carter*, 236 F.3d at 783. They were and they do.

As stated, when determining whether prosecutorial misconduct is flagrant and amounts to plain error, we consider four factors. *See Carroll*, 26 F.3d at 1384. Here, all four of the factors support a finding of flagrancy.

a.      The Tendency of the Remarks to Mislead the Jury and to Prejudice the Accused

All of the challenged remarks had "a tendency to mislead the jury" or "to prejudice the accused." *Id.* (quoting *Leon*, 534 F.2d at 679). First, the remarks were prejudicial to Morales-

---

[7]Three vouching or bolstering remarks; three attacks on Barnes's credibility; and three attacks on Morales-Montanez's worship of the statue—one line of questioning during cross-examination and two sections of the closing argument, the second of which was also an attack on Morales-Montanez's credibility. We note that no particular number of improper comments marks the boundary between flagrant impropriety and non-flagrant impropriety. Instead, plain-error determinations are driven by the unique facts of each case. *Young*, 470 U.S. at 16.

Montanez and Acosta because they implied or asserted that a government witness was trustworthy, a defense witness was lying, or a defense witness had broken one of the Ten Commandments.  The prejudicial effect of the remarks accrued to Acosta, who did not testify, as well as to Morales-Montanez, because the theory of the defense was the same for both.

Second, at least two of the remarks were misleading.  One misleading remark was the prosecutor's assertion that Detective Bowles—who testified that he had found the methamphetamine and that it had not been wrapped in clothes as Barnes had described— "remembered everything he did."  That assertion suggested that Bowles had an accurate memory, a fact unsupported by evidence.  Also misleading was the prosecutor's claim that Barnes was "a proven liar."  The word "proven" could suggest either that Barnes's testimony had been undermined by other evidence at trial or (inaccurately) that Barnes's untruthfulness had been legally established.  Because the prosecutor did not tie the "proven" remark to a discussion of Barnes's testimony, the remark encouraged the jury to take the latter view and trust the prosecutor that "anything [Barnes] had to say" had been conclusively discredited.

### b.          Whether the Remarks Were Isolated or Extensive

The improper remarks were not isolated.  In a three-day trial, with evidence presented over two days and closing arguments and deliberations taking place on the third, the nine improper remarks were relatively extensive.  Nor were they confined to one portion of the proceeding.  Rather, the prosecutor maligned Morales-Montanez's prayers to the statue during cross-examination on day two of the trial and during closing argument on day three, and he assailed both defense witnesses' credibility, and vouched for government witnesses, at various points during closing argument.

### c.          Whether the Remarks Were Deliberate or Accidental

Most of the remarks appear to have been deliberate.  The prosecutor returned to the subjects of the prayers and credibility several times and in similar terms; evidently, he made a choice to emphasize those subjects.  Here was no inadvertent slip of the tongue.

"The intentionality of the prosecutor's improper remarks can be inferred from their strategic use." *Bates*, 402 F.3d at 648. In *Bates*, we vacated a death sentence and remanded for resentencing where the prosecutors' misconduct appeared to have been deliberate because the prosecutors "use[d] [inappropriate themes] repeatedly during summation" in the sentencing phase of trial. *Id.* Among other actions, the prosecutors had repeatedly offered their personal opinions that the defendant's mitigation witnesses were not credible. We noted that "[t]he personal opinion of the prosecutors was primarily reserved for evaluating the testimony of the defense's one disinterested witness, Dr. Griffin. [The defendant's] case for mitigation rested on Dr. Griffin and [the defendant's] mother, and the prosecutors repeatedly undermined Dr. Griffin's testimony by suggesting they did not believe it." *Id.* Similarly, here, the defense theory rested on the testimony of only two witnesses. The prosecutor attacked the credibility and character of both, but he aimed his most direct comments on credibility at Barnes, the more disinterested witness of the two.

d.          The Strength of the Evidence Against Morales-Montanez and Acosta

Most importantly, the evidence supporting the convictions, although sufficient, was far from overwhelming. As mentioned, all evidence tying Morales-Montanez and Acosta to the methamphetamine was circumstantial. The government presented the following facts purporting to link Morales-Montanez and Acosta to the methamphetamine: (1) the methamphetamine was found in an apartment leased by Acosta; (2) officers saw Morales-Montanez and Acosta at the apartment several times; (3) officers trailed Morales-Montanez and Acosta driving between the home and the apartment and believed they drove evasively on those trips. All of this evidence either tied the methamphetamine to the apartment or tied Morales-Montanez and Acosta to the apartment, but none of it necessarily tied Morales-Montanez and Acosta to the methamphetamine. And Morales-Montanez and Acosta admitted having been to the apartment, so the jury could have believed their innocent explanation. The jury's view of Morales-Montanez and Barnes's credibility was therefore central to its guilt-or-innocence determination.

This case differs markedly from those cases in which we have found prosecutorial misconduct outweighed by the strength of the government's evidence. For example, in *Modena*, we found misconduct was not flagrant where the prosecutor had made only two improper

remarks during closing argument; the government presented thirty witnesses and over 200 exhibits in support of the defendant's conviction for tax-evasion charges; and the defendant presented no evidence. 302 F.3d at 629, 635. In *Cristini v. McKee*, 526 F.3d 888, 902 (6th Cir. 2008), we found that a prosecutor's alleged misconduct was not flagrant because the remarks had not been misleading and "the case against the Petitioner was strong": "[t]hree disinterested witnesses corroborated" the testimony of the petitioner's co-defendant (who had turned state's evidence), "and one of those [disinterested] witnesses identified the Petitioner." Here, by contrast, no eyewitness or physical evidence tied Morales-Montanez and Acosta to the methamphetamine, and the defense presented an innocent explanation not necessarily incompatible with the government's circumstantial evidence.

Indeed, even one unfairly prejudicial remark may warrant reversal where the evidence of guilt is not very strong and the defense offers a non-incriminating explanation. In *United States v. Love*, 534 F.2d 87, 89 (6th Cir. 1976), we reversed the defendant's conviction for communicating threats of injury in interstate commerce because the prosecutor had asked—with no evidentiary support for the question—whether the defendant's employer "was part of another organization 'of ill character like [the] Mafia or anything like that.'" Because "the jury found appellant not guilty of four counts of the indictment and guilty of only two counts, and since the evidence [was] susceptible to an interpretation of innocent behavior, we [could not] regard the prejudice as harmless." *Id.* Although defense counsel had objected contemporaneously to the Mafia comment and the *Love* court did not engage in a flagrancy analysis, the same common sense about the effect of prejudicial comments in a close case applies here. The evidence against Morales-Montanez and Acosta was not overwhelming, and any one or several of the prosecutor's improper comments may have tipped the balance toward conviction.

4.      Remaining Arguments by the Government

The government makes two arguments for why the prosecutor's comments were not reversible misconduct. Both fail.

First, the government argues that the aspersions on Barnes's credibility were "not plainly erroneous," United States Br. at 17, because the defense put Barnes's credibility in issue by

having him testify and by telling the jury during opening statements that "you're going to conclude [Barnes is] telling the truth." R. 126, PageID 743. However, that the defense has put a witness's credibility in issue does not mean that the prosecutor may attack credibility any way he sees fit. *See Francis*, 170 F.3d at 552 ("Because [the defendant] took the stand, it was not improper for the prosecutor to question his credibility. The impropriety stems from the manner in which she did so [i.e., by stating that the defendant was lying without citing evidence to support that statement]."). If the government were correct that any time a defense witness takes the stand, his credibility may be attacked in unscrupulous and broadly worded terms as long as defense counsel does not object, then our case law on flagrant prosecutorial misconduct would be cast into doubt. *See, e.g.*, *Bates*, 402 F.3d at 647–48. What is more, the prosecutor's repeated attacks on Barnes's credibility during closing argument were disproportionate to defense counsel's lone prediction at the beginning of trial that the jury would "conclude [Barnes was] telling the truth."

Second, the government argues that "the district court mitigated any possible prejudicial impact by instructing the jury that arguments and statements by lawyers are not evidence." United States Br. at 3. The district court did so instruct the jury. *See* R. 131, PageID 1444–45. Nevertheless, that general instruction was not sufficient to remedy the effect of the prosecutor's repeated prejudicial remarks about Morales-Montanez and Barnes and favorable comments on the government's witnesses. We found a similar instruction inadequate to "cure[] the prejudice caused by" a prosecutor's misrepresentations of evidence and "attacks on defense counsel's truthfulness" where, as here, the instruction "was made along with all other routine instructions for evaluating the evidence presented at trial," and "the instruction was not given at the time of the improper comments" but "was given only after closing arguments had been completed." *Carter*, 236 F.3d at 787.

In sum, Morales-Montanez and Acosta's trial was fundamentally unfair because of the prosecutor's flagrant misconduct. Morales-Montanez and Acosta are therefore entitled to a new trial.

### III.  CONCLUSION

For the foregoing reasons, we **VACATE** Morales-Montanez and Acosta's convictions and sentences on the methamphetamine count and **REMAND** for a new trial.

---

**CONCURRENCE**

---

HELENE N. WHITE, Circuit Judge, concurring.  I write simply to state that separate and apart from the improper vouching, bolstering, and attacks on Barnes's credibility, which may not on their own warrant a new trial, I find the prosecutor's questions and argument regarding Morales-Montanez's religious practices and beliefs necessitate reversal in and of themselves.