NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0539n.06

Case No. 22-5115

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Dec 27, 2022
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY |
| | ) | |
| KENDRICK LAMAR FLINTROY, | ) | |
| Defendant-Appellant. | ) | |
| | ) | O P I N I O N |

Before: CLAY, GIBBONS, and McKEAGUE, Circuit Judges.

McKEAGUE, Circuit Judge. Defendant-Appellant Kendrick Lamar Flintroy appeals his conviction for possession with intent to distribute fifty grams or more of methamphetamine, in violation of 21 U.S.C. § 841(a)(1). On appeal, Flintroy argues that the prosecution plainly erred by presenting extensive testimony raising a "community protection" argument during its direct examination of Drug Enforcement Administration (DEA) Special Agent Jason Moore. Because the prosecution's direct examination of Moore and Moore's corresponding testimony were proper, the prosecution did not err, much less plainly err, and we affirm.

**I**

**A. Background**

At approximately 1:30 in the morning on December 7, 2020, Franklin County Sheriff's Office Deputy Phillip Ray observed a Chevrolet Impala merge onto I-64 in Frankfort, Kentucky.

Ray paced the vehicle at eighty-five miles per hour, fifteen miles over the interstate's speed limit. When it was safe to do so, Ray turned on his emergency lights and signaled for the vehicle to pull over. The driver promptly moved toward the highway's shoulder, but as the car came to a rolling stop, the passenger—since identified as Defendant-Appellant Kendrick Flintroy—opened the passenger door and sprinted away with a bag in each hand.

Ray immediately chased after Flintroy, repeatedly shouting "Police, stop." Meanwhile, the car—driven by Flintroy's friend, Jack Page—sped off. Flintroy continued to run away from the interstate, up an embankment, and toward a barbed wire fence. Upon reaching the fence, Flintroy threw both bags to the other side and attempted to scale the barrier. When he was unsuccessful, he doubled back toward the interstate. Shortly thereafter, Flintroy tripped and fell, at which point Ray was able to deploy his taser, apprehend Flintroy, and take him into custody.

After effecting the arrest, Ray contacted the Frankfort Police Department to request that they collect the two bags that had been thrown over the fence and into Frankfort city limits. Frankfort Police Department Sergeant Patrick Brooks was among the officers dispatched to the scene. When he arrived, he activated his body camera and searched the bags, discovering nine vacuum-sealed packages. Brooks later testified that he recognized the packages' contents to be methamphetamine. In one of the bags, which was marked with the name "Kaleb F.", the officers discovered a credit or debit card bearing Flintroy's name and a pair of infant's socks. Notably, Flintroy has a son named Kaleb who was less than two years old at the time.

The bags were booked into evidence and sent to a Drug Enforcement Administration laboratory for testing. There, forensic chemists determined that the substance found in the bags was 9,384 grams (roughly twenty pounds) of 95% pure methamphetamine hydrochloride and dimethyl sulfone.

A federal grand jury returned an indictment charging Flintroy with knowing and intentional possession with intent to distribute fifty grams or more of methamphetamine, in violation of 21 U.S.C. § 841(a)(1). A jury trial was held in October 2021, and after two days of testimony, the jury found Flintroy guilty. The district court sentenced Flintroy to 300 months' imprisonment and a five-year term of supervised release. Flintroy timely appealed.

### B. The Challenged Testimony

At trial, the government called as witness DEA Special Agent Jason Moore. The prosecution's questioning of Moore is the subject of this appeal.

Moore was not involved in Flintroy's arrest. Instead, he was called as an expert witness to provide opinion testimony regarding general practices of the drug trade and whether the quantity of drugs seized in this case suggests distributive intent. According to his testimony, Moore began working as a DEA Special Agent in 2009. In that capacity, Moore and his colleagues are responsible for conducting drug trafficking investigations, wherein they attempt "to develop cases that involve either sophisticated drug trafficking organizations that operate and have a nexus to [their] region, or individuals that have a significant community impact." R. 69 at PID 618–19.

The government began its direct examination of Special Agent Moore by asking him a variety of questions related to his qualifications, knowledge, and experience in the drug trafficking field, such as his familiarity with controlled buys; the DEA's use of search warrants in narcotics investigations; the DEA's reliance on local law enforcement agencies; the types and prices of drugs he most commonly comes across as DEA Special Agent; any additional education, training, or experience that enables him to understand the drug trafficking trade in Kentucky; and whether he had previously testified in court. Notably, not one of these questions expressly called upon the jury to protect the community by convicting Flintroy.

The government proceeded to ask Moore if he was familiar with the terms "high-level dealers" and "suppliers," and whether Moore could "break down the drug trafficking trade or further the scheme of how it works in those different levels." R. 69 at PID 625. In response, Moore differentiated between individual "street-level retailers," more "mid-level folks . . . dealing with ounce levels," and those "on the top end of [the] spectrum" who deal in "pound quantities." *Id.* at 626. According to Moore, the DEA generally goes "for the biggest fish," and does not typically target users. *Id.* at 629. The government then asked Moore to elaborate on the typical "use amount" for methamphetamine, as well as methamphetamine's average price by gram, ounce, and pound.

Only after the government laid this foundation with Agent Moore did it begin to question him about the specifics of Flintroy's case:

> Q. Based on your training and experience given the weight of the narcotics that were seized, were you able to form an opinion as to whether or not that amount was consistent with drug trafficking, or what you'd see for personal use?
>
> A. It is absolutely consistent with drug trafficking.
>
> Q. And based on your experience as well, is the amount that was seized in this case consistent with a lower level or a higher level narcotics trafficker?
>
> A. For our area, that would be a very high-level trafficker.

R. 69 at PID 631–32.

## II

Claims for prosecutorial misconduct are typically reviewed de novo. *United States v. Lawrence*, 735 F.3d 385, 432 (6th Cir. 2013). But where, as here, "the defendant failed to object during trial, the claim is reviewed for plain error." *Id.* "Plain error has three elements: '(1) error, (2) that is plain, and (3) that affect[s] substantial rights.'" *United States v. Acosta*, 924 F.3d 288, 299 (6th Cir. 2019) (quoting *Johnson v. United States*, 520 U.S. 461, 467 (1997)). An error "affects

substantial rights" when it has an effect on the outcome of the case. *United States v. Walker*, 761 F. App'x 547, 551 (6th Cir. 2019).

In reviewing claims of prosecutorial misconduct, this Court must first determine whether the prosecutor's comments—or, in this case, questions—were improper. *Lawrence*, 735 F.3d at 431. If we find the comments were improper, we must then consider whether they "were so flagrant as to warrant reversal." *Id.* at 431.

### III

The crux of this appeal is whether prosecutorial misconduct plainly occurred during the government's direct examination of Special Agent Moore. Flintroy contends that the prosecutor's questioning of Moore implicitly introduced an impermissible "community protection" argument, rendering his trial "fundamentally unfair." Appellant's Br. at 18. Although Flintroy fails to concretely define what is meant by "community protection argument," a summary of the concept can be inferred from the cases he cites:

> A prosecutor may not urge jurors to convict a criminal defendant in order to protect community values, preserve civil order, or deter future lawbreaking. The evil lurking in such prosecutorial appeals is that the defendant will be convicted for reasons wholly irrelevant to his own guilt or innocence. Jurors may be persuaded by such appeals to believe that, by convicting a defendant, they will assist in the solution of some pressing social problem. The amelioration of society's woes is far too heavy a burden for the individual criminal defendant to bear.

*United States v. Solivan*, 937 F.2d 1146, 1153 (6th Cir. 1991) (quoting *United States v. Monaghan*, 741 F.2d 1434, 1441 (D.C. Cir. 1984)).

In essence, Flintroy argues that extensive testimony regarding Kentucky's "war on drugs" portrayed him as "one of the 'biggest fish' and a very high-level trafficker" and thus "a major source of the drug problem in Kentucky." Appellant's Br. at 34. As a result, the argument goes,

the government impermissibly suggested to the jury that convicting Flintroy would "protect the community." *Id.* For the following reasons, Flintroy's argument lacks merit.

First, as a preliminary matter, the testimony elicited by the prosecutor was plainly proper and admissible under both this Court's precedent and the Federal Rules of Evidence. This Court has consistently held that expert testimony establishing the modus operandi of drug trafficking crimes "is admissible under Federal Rule of Evidence 702 because it assists the jury in understanding the drug trade, an area which is 'not within the experience of the average juror.'" *United States v. Meadows*, 822 F. App'x 434, 437 (6th Cir. 2020) (quoting *United States v. Thomas*, 74 F.3d 676, 682–83 (6th Cir. 1996)). Because jurors are not likely to understand complex drug trafficking operations, or even the distinction between street-level dealers and high-level suppliers, courts consistently admit expert testimony that is offered to explain "the quantity of drugs consistent with distribution rather than personal use." *Meadows*, 822 F. App'x at 438. Here, Moore's testimony not only helped to contextualize drug trafficking operations in Kentucky, but it helped to establish why the quantity of drugs seized in this case was consistent with an intent to distribute—an element of Flintroy's charged offense.

Second, and more importantly, Flintroy's assertion that the prosecutor made an impermissible "community protection" argument is simply not borne out by the record. Indeed, Flintroy fails to offer a single example of the prosecutor explicitly asking, or even encouraging, the jury to convict the defendant in order to protect the broader Kentucky community. And there is similarly no support for Flintroy's assertion that such message was even *implied* by the prosecutor's questions. To the contrary, the prosecutor's direct examination of Agent Moore was limited to Moore's qualifications, knowledge, and experience in the field, and was intended to

contextualize drug trafficking operations in Kentucky and to explain drug quantities typically associated with distributive intent.

Despite the lack of evidence in the record to support his prosecutorial misconduct claim, Flintroy attempts to analogize his case to *Solivan*, wherein this Court held that a prosecutor's appeal to community conscience constituted reversible error. 937 F.2d at 1157. In that case, the prosecutor stated during closing arguments:

> *What you're listening to is a wholesale distributor of narcotics, cocaine discuss her business affairs* and complain about her busy schedule, the lack of good product and the trouble she's having getting this stuff up here now. And I'd submit to you, folks, that *she's been caught now. And I'm asking you to tell her and all of the other drug dealers like her*—(defense counsel's objection and Court's response omitted)—*[t]hat we don't want that stuff in Northern Kentucky and that anybody who brings that stuff in Northern Kentucky . . .*

*Id.* at 1148 (emphasis and alterations in original). The district judge sustained defense counsel's objection and admonished the jury by stating the following:

> At the conclusion . . . certain remarks were made in the closing argument of the prosecutor to which this Court has sustained an objection and will admonish you not to consider them. Do not consider the urgings by the prosecutor to send messages to anybody. We're not here to send messages to anybody. We're here to try this defendant's case.

*Id.* at 1149.

On appeal, this Court concluded that the prosecutor's remarks had been "deliberately injected into the proceedings to incite the jury against defendant" and that "[t]he prosecutor . . . went beyond stating the obvious, [going] so far as to urge the jury to send a message to the community, to defendant and 'all of the drug dealers like her' by convicting defendant." *Id.* at 1154–55. Given the inflammatory nature of the statements, this Court reversed the defendant's judgment and sentence. *Id.* at 1157.

But *Solivan* is easily distinguishable. First, the defense counsel in *Solivan* objected to the prosecutor's statements at trial. De novo review was thus the appropriate standard on appeal. Here, however, Flintroy's counsel made no such objection below. Plain error review therefore applies. *Lawrence*, 735 F.3d at 432. Second, and more importantly, the prosecutor in *Solivan* made an explicit appeal to the jury, asking that they send a message: "I'm asking you to tell her and all of the other drug dealers like her . . . that we don't want that stuff in Northern Kentucky." *Solivan*, 937 F.2d at 1148. The prosecutor in Flintroy's case made no such remark during the direct examination of Agent Moore—or at any other point during Flintroy's trial.

In *United States v. Cleveland*, a panel of this Court considered that fact fatal to an appellant's similar claim. 907 F.3d 423, 438 (6th Cir. 2018). There, during closing arguments, the prosecutor stated: "This is a serious day for the Defendant and a serious day for the United States because ten kilograms of cocaine is sitting here in bricks. But if this had gotten into the community, lives would have been at stake." *Id.* at 437. On appeal, this Court held that the prosecutor's remarks did not constitute prosecutorial misconduct, concluding that "[t]he statement was not a request to 'send a message.' Instead, the government was referencing the common fact that drugs are a community problem without asking the jury to fix or combat that problem through a verdict. . . . In other words, the government's statement does not rise to the level of 'do your duty' and/or 'send a message with your verdict[.]" *Id.* at 438. Likewise, here, not one of the prosecutor's questions during the direct examination of Agent Moore amounted to a request that the jury send a message by convicting Flintroy. If the prosecutor's remarks in *Cleveland*, which expressly referenced a danger to the community, do not constitute prosecutorial misconduct, the prosecutor's conduct in this case—for which no evidence of any reference to community protection can be found—cannot amount to reversible error.

The prosecutor's direct examination of Agent Moore was, as the government puts it, "standard fare." *See* Appellee's Br. at 6. As an expert witness, Moore offered opinion testimony that stemmed from his many years of experience in law enforcement, and the prosecutor's direct examination of Moore was limited to that expertise. At no point did the prosecutor expressly or impliedly call upon the jury to convict Flintroy in order to protect the community. On appeal, Flintroy bears the burden of demonstrating that the prosecutor's conduct seriously affected the fairness of the proceedings, and he cannot meet that burden.[1]

**IV**

For the foregoing reasons, we AFFIRM.

---

[1] Because we find that the prosecutor's conduct was proper, we need not assess whether that conduct was flagrant. *See Lawrence*, 735 F.3d at 431–32.